

1996 Decisions

6-20-1996

# Chemical Leaman v. Aetna Casualty & Surety

Precedential or Non-Precedential:

Docket 93-5777,93-5794

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Chemical Leaman v. Aetna Casualty & Surety" (1996). *1996 Decisions.* Paper 154.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/154

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

CHEMICAL LEAMAN TANK LINES, INC.

v.

THE AETNA CASUALTY AND SURETY COMPANY;
and CERTAIN UNDERWRITERS AT LLOYDS, LONDON,
subscribing to Insurance Policies Numbers
WAR 6771, WAR 6772/A, C62P 10-117, L62P 10-117,
64P 3-121, L64P 3-121A, L64P 3-121B, C64P 3-121B,
C65P 5-119, C65P 5-119A, L65P 5-119A, L66P 5-119A,
C67P 4-158, L67P 4-158, C68P 2-116, L68P 2-116,
C68P 2-116A, C68P 2-116B, L68P 2-116A, L68P 2-116B,
C71-03-03-13, L71-03-03-13, C71-03-03-13A,
C71-03-03-13B, L71-03-03-13A, L71-03-03-13B,
C74-03-18-02, 77-01-19-23, 77-01-19-23A, C77-01-19-23B,
79-04-19-10, C80-02-19-09, C80-02-19-09B, L80-02-09A,
L80-02-19-09A, L80-02-19-09B, C83-02-19-09,
L83-02-19-09A, L83-02-19-09B, L83-02-19-09C


ROBIN ANTHONY GILDART JACKSON, an Underwriter at Lloyds,
London, individually and in his capacity as representative
Underwriter at Lloyds, London for certain subscribing
Underwriters at Lloyds, London who subscribed to certain
liability insurance policies issued to plaintiff Chemical
Leaman Tank Lines, Inc.; ACCIDENT AND CASUALTY COMPANY OF
WINTERTHUR; ALBA GENERAL INSURANCE COMPANY LTD.; ALLIANZ
CORNHILL INTERNATIONAL INSURANCE PLC, FORMERLY KNOWN AS
ALLIANZ INTERNATIONAL INSURANCE COMPANY LTD.; ANGLO-FRENCH
INSURANCE COMPANY LTD.; ARGONAUT NORTHWEST INSURANCE
COMPANY; ASSICURAZIONI GENERALI SPA; BALOISE FIRE INSURANCE
COMPANY; BELLEFONTE INSURANCE COMPANY LTD.; BRITISH NATIONAL
LIFE INSURANCE SOCIETY LTD.; CNA INTERNATIONAL REINSURANCE
CO. LTD., FORMERLY KNOWN AS CNA REINSURANCE OF LONDON LTD.;
DELTA LLOYD NON-LIFE INSURANCE COMPANY; DOMINION INSURANCE
COMPANY LTD.; DRAKE INSURANCE COMPANY LTD.; EDINBURGH
INSURANCE COMPANY; EXCESS INSURANCE COMPANY LTD.; FIDELIDADE
INSURANCE COMPANY; FOLKSAM INTERNATIONAL INSURANCE COMPANY
(U.K.) LTD.; HELVETIA ACCIDENT SWISS INSURANCE COMPANY;
INDEMNITY MARINE ASSURANCE COMPANY, LTD.; LEXINGTON
INSURANCE COMPANY LTD.; LONDON & OVERSEAS INSURANCE COMPANY,
LTD.; LONDON & EDINBURGH INSURANCE COMPANY, LTD.; LONDON &
SCOTTISH ASSURANCE CORPORATION, LTD.; GAN MINSTER INSURANCE
COMPANY, FORMERLY KNOWN AS MINSTER INSURANCE COMPANY LTD.;

NATIONAL CASUALTY COMPANY; NATIONAL CASUALTY INSURANCE OF AMERICA, LTD.; NEW LONDON REINSURANCE COMPANY, LTD.; NORTH ATLANTIC INSURANCE COMPANY LTD., FORMERLY KNOWN AS BRITISH NATIONAL INSURANCE CO. LTD.; ORION INSURANCE COMPANY LTD.; PINE TOP INSURANCE COMPANY LTD.; RIVER THAMES INSURANCE COMPANY LTD.; SCOTTISH LION INSURANCE COMPANY; SOVEREIGN MARINE AND GENERAL INSURANCE COMPANY, LTD.; SPHERE INSURANCE COMPANY LTD.; ST. KATHERINE INSURANCE COMPANY LTD.; STRONGHOLD INSURANCE COMPANY LTD.; SWISS UNION GENERAL INSURANCE COMPANY LTD.; TAISHO MARINE & FIRE INSURANCE COMPANY (EUROPE) LTD., FORMERLY KNOWN AS TAISHO MARINE & FIRE INSURANCE COMPANY (U.K.) LTD.; TOKIO MARINE & FIRE INSURANCE COMPANY (U.K.) LTD.; TUREGUM INSURANCE COMPANY LTD.; UNIONAMERICA INSURANCE COMPANY; UNITED STANDARD INSURANCE COMPANY LTD.; WINTERTHUR SWISS INSURANCE COMPANY; WORLD AUXILIARY INSURANCE CORPORATION LTD.; YASUDA INSURANCE COMPANY (U.K.) LTD. (hereinafter collectively referred to as "Jackson & Companies"),
Appellants at No. 93-5777

AETNA CASUALTY AND SURETY COMPANY ("AETNA"),
Appellant at No. 93-5794

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 89-cv-1543 )
_____

Argued September 26, 1994

Decided October 12, 1995

Petition for Panel Rehearing Granted
and Opinion and Judgment Vacated
December 15, 1995

Submitted on Petition for Panel Rehearing
December 15, 1995

Before:  SCIRICA, NYGAARD and McKEE, Circuit Judges

(Filed June 20, 1996)

HENRY LEE, ESQUIRE (ARGUED)
GARY P. SCHULZ, ESQUIRE

JOHN G. McANDREWS, ESQUIRE
HANNAH M. O'DRISCOLL, ESQUIRE
Mendes & Mount
750 Seventh Avenue
New York, New York 10019

WILLIAM J. HANLEY, ESQUIRE
Ronca, McDonald & Hanley
5 Regent Street, Suite 517
Livingston, New Jersey 07039

  Attorneys for Appellants at No. 93-5777


BRIAN J. COYLE, ESQUIRE (ARGUED)
PETER E. MUELLER, ESQUIRE
HARWOOD LLOYD, ESQUIRE
130 Main Street
Hackensack, New Jersey 07601

WILLIAM H. JEFFRESS, JR., ESQUIRE
Miller, Cassidy, Larroca & Lewin
2555 M Street, N.W., Suite 500
Washington, D.C. 20037

EDWARD M. DUNHAM, JR., ESQUIRE
Miller, Dunham & Doering
1515 Market Street, 13th Floor
Philadelphia, Pennsylvania 19102

  Attorneys for Appellant,
  Aetna Casualty and Surety Company


KEVIN B. CLARK, ESQUIRE (ARGUED)
JOHN P. DEAN, ESQUIRE
CONRAD J. SMUCKER, ESQUIRE
Willkie, Farr & Gallagher
Three Lafayette Centre, Suite 600
1155 21st Street, N.W.
Washington, D.C. 20036

  Attorneys for Appellee,
  Chemical Leaman Tank Lines, Inc.


THOMAS W. BRUNNER, ESQUIRE
Wiley, Rein & Fielding
1776 K Street, N.W.
Washington, D.C. 20006

  Attorney for Amicus Curiae Appellant,
  Insurance Environmental Litigation Association

KAREN L. JORDAN, ESQUIRE
Office of Attorney General of New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
Trenton, New Jersey 08625

   Attorney for Amicus Curiae Appellee, State of New Jersey,
   New Jersey Department of Environmental Protection & Energy


_____

OPINION OF THE COURT
_____


SCIRICA, Circuit Judge.


        Chemical Leaman Tank Lines, Inc. brought this
declaratory judgment action against Aetna Casualty and Surety
Company and the London Market Insurers, seeking a declaration
that defendants' insurance policies covered the cost of
environmental clean-up at Chemical Leaman's Bridgeport, New
Jersey facility.  After a three week trial, a jury found Chemical
Leaman was entitled to partial coverage under several policies.
Thereafter the New Jersey Supreme Court decided Morton Intern.,
Inc. v. General Acc. Ins. Co., 629 A.2d 831 (N.J. 1993), cert.
denied, 114 S. Ct. 2764 (1994), which interprets several key
provisions of comprehensive general liability insurance policies
in the context of environmental pollution.  Defendant insurers
now appeal, contending the district court incorrectly instructed
the jury on whether Chemical Leaman "expected or intended" to
cause environmental damage under Morton.  We believe Mortonrequires an
inquiry into the insured's subjective intent to cause
environmental harm, unless "exceptional circumstances" support a
presumption of the insured's subjective intent.  Therefore we
conclude the district court's jury instructions were proper.
        Defendant insurers raise several other issues on
appeal.  They argue the district court mistakenly limited the
applicability of the policies' pollution exclusion clause,
incorrectly adopted the "continuous trigger" theory as New Jersey
law, and ignored the prejudicial effect of Chemical Leaman's
failure to file its claims for coverage in a timely manner.  They
also dispute the district court's exclusion of evidence relating
to environmental contamination at other Chemical Leaman
facilities.  We will affirm the district court's holdings on the
pollution exclusion clause, the "continuous trigger" theory, and
timely notice.  We also conclude that the exclusion of certain
evidence was within the sound discretion of the district court.
                    I.  Background
          A.  Contamination at the Bridgeport Facility

Chemical Leaman Tank Lines, Inc., a tank truck company that specializes in the transport of chemicals and other liquids, operates a number of tank truck cleaning facilities around the country, including one in Bridgeport, New Jersey. At the Bridgeport facility, Chemical Leaman disposed of rinsewater contaminated with chemical residue during the cleaning process into a water treatment system designed by Harry Elston, Chemical Leaman's Manager of Real Estate and Engineering, and Harry Wagner, a professional sanitary engineer. At its inception in 1960, the Bridgeport water treatment system consisted of three unlined ponds connected by "tee pipes." The ponds were intended to purify rinsewater by filtering out contaminants as the water seeped into the soil. The designers of the system believed that the forces of gravity would separate contaminates from the rinsewater, and that natural processes of aerobic and anaerobic microbial degradation would break down trace contaminants. An overflow pipe drained from the final pond of the water treatment system into an adjacent swamp in order to allow water to escape in the case of heavy rains.

In September 1961, an Inspector with the New Jersey Division of Fish Game & Wildlife informed Chemical Leaman that its water treatment system was "not satisfactory." In response, Chemical Leaman constructed two additional aeration lagoons and a settling lagoon with a limestone bed. The lagoons were designed to function in the same manner as the first three ponds. But the overflow pipe still drained from the last lagoon into the neighboring swamp.

Water pollution inspectors with the New Jersey Department of Health observed discharge from the overflow pipe into the swamp in November 1968. They found the discharge to be "highly pollutional" and ordered Chemical Leaman to submit a plan to improve its water treatment system. In May 1969, Chemical Leaman submitted a plan, but state regulators found it to be unsatisfactory. Thereafter state regulators and Chemical Leaman unsuccessfully attempted to reach agreement. Finally, on January 28, 1974, Chemical Leaman and the New Jersey Department of Environmental Protection entered into a consent decree in which Chemical Leaman agreed to construct an approved water treatment facility. In 1975, Chemical Leaman arranged for its wastewater to be treated by Du Pont and ceased to use the system of ponds and lagoons. Subsequently, Chemical Leaman drained the ponds and lagoons, dredged them, and filled them with brickbat, sand and concrete.

In 1980, a routine survey by the New Jersey Department of Environmental Protection discovered groundwater contamination at and around the Bridgeport site. Subsequent investigations established that the ponds and lagoons were the primary source of groundwater contamination on the site, and that several private wells near the facility were either contaminated or threatened with contamination. The federal Environmental Protection Agency placed the Bridgeport site on the Superfund National Priorities List in 1984, and, in 1985, Chemical Leaman entered into a consent order with the EPA. Chemical Leaman admitted liability under the Comprehensive Environmental Response, Compensation and

Liabilities Act ("CERCLA") and agreed to remediate the Bridgeport site or to pay for its remediation.

Chemical Leaman gave notice of claims to Aetna in April 1988, and to the London Market insurers ("LMI") in March 1989. Aetna and the LMI refused to defend or indemnify Chemical Leaman for costs incurred in connection with the clean-up of the Bridgeport site. Chemical Leaman then filed this suit.

### B. The Insurance Policies

Chemical Leaman purchased comprehensive general liability insurance from Aetna covering successive years from April 1, 1959 through April 1, 1985. It purchased excess comprehensive general liability policies covering the same period from the LMI. The LMI challenge the district court's interpretation of several provisions of the policies purchased by Chemical Leaman. Because Aetna has withdrawn from this appeal, we need not discuss its policies.

The LMI policies were standard form "occurrence-based" policies, meaning they insured against "occurrences" as defined in the policies. The insuring clause in the LMI policies typically stated that the LMI agreed:

> [s]ubject to the limitations, terms and
> conditions [of the policy] to indemnify the
> Assured for all sums which the Assured shall
> be obligated to pay by reason of the
> liability . . . imposed upon the Assured by
> law, . . . for damages . . . on account of:
> . . . (ii) Property Damage . . . caused by or
> arising out of each occurrence.

The LMI policies defined "occurrence" as "[a]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . property damage . . . during the policy period" (emphasis added). The combined effect of the insuring clause and the definition of "occurrence" is to preclude coverage for property damage that is expected or intended by the insured. On appeal, the LMI contend the district court incorrectly instructed the jury on the legal standard by which to evaluate Chemical Leaman's expectation or intention to cause property damage.

Each LMI policy in effect from 1971 to 1985 also contained a pollution exclusion clause. The LMI policies in effect from April 1, 1971 to April 1, 1974, and from April 1, 1977 to April 1, 1985 contained the standard form exclusion known as NMA 1685. NMA 1685 does not cover personal injury or property damage caused by seepage, pollution, or contamination unless "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of [the] insurance." The LMI policies in effect from April 1, 1974 to April 1, 1977 contained the standard industry pollution exclusion clause, the so-called "ISO" pollution exclusion, which precludes coverage for pollution and contamination, unless the "discharge, dispersal, release or escape is sudden and accidental." Both the ISO pollution exclusion clause and the NMA 1685 pollution exclusion clause focus on the insured's intention and expectation to discharge pollutants, not on the insured's intention or

expectation to cause property damage. On appeal, the LMI argue the pollution exclusion clauses bar coverage under the 1971 to 1985 policies because Chemical Leaman's discharges of pollutants were not sudden, unintended, or unexpected.

Finally, the LMI policies require the insured to provide written notice "as soon as practicable" following an occurrence. The LMI argue that Chemical Leaman's failure to comply with this provision bars coverage.

## II. Procedural History

Chemical Leaman filed this declaratory judgment action in 1989 after the insurers' refusal to indemnify it for the costs of environmental clean-up at the Bridgeport facility. Following extensive discovery, the parties filed cross-motions for summary judgment on various grounds. The district court granted partial summary judgment in favor of Chemical Leaman, holding that New Jersey law applied, and that the "owned property exclusion" did not bar coverage for the costs of remediation of onsite soil contamination designed to correct injury to surrounding properties. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 788 F. Supp. 846 (D.N.J. 1992).

After subsequent cross-motions for summary judgment, the district court held Chemical Leaman bore the burden of proving it did not subjectively expect or intend the damage to the soil and groundwater for which it sought coverage. SeeChemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F. Supp. 1136, 1146 (D.N.J. 1993). It also found Chemical Leaman's actions were not so "reprehensible" as to objectively establish that it expected or intended to cause damage. Id. The court then denied the cross-motions for summary judgment because there remained genuine issues of fact about Chemical Leaman's subjective intent. Id. at 1152.

The district court also held as a matter of law that damage to the soil and groundwater occurred during the April 1, 1960 to April 1, 1961 policy year because Chemical Leaman began depositing rinsewater in the ponds during that time period. The district court noted that from 1960 to 1975, Chemical Leaman disposed of 10,000 to 20,000 gallons of rinsewater into the ponds each day, but did not find that property damage occurred during that period as a matter of law. Id. Rather, it ruled that New Jersey follows the "continuous trigger" theory and that factual issues remained as to whether Chemical Leaman suffered continuous, indivisible property damage from 1961 to 1985.

The district court interpreted the pollution exclusion clauses in the LMI's post-1971 policies as precluding coverage "when the insured has caused the discharge of contaminants or pollutants, unless the discharge was neither expected nor intended from the standpoint of the insured." Id. at 1157. On the basis of the pollution exclusion clauses, the district court granted partial summary judgment in favor of defendants as to soil damage on the post-1971 policies. It denied summary judgment with respect to groundwater contamination, and did not address contamination to the surrounding wetlands. Id. Finally, the district court held Chemical Leaman's failure to give timely notice of its claims did not preclude insurance coverage because

the delay had not prejudiced the defendant insurers.  Id. at 1157-58.

Before trial, Chemical Leaman filed a motion in limineto exclude evidence relating to waste disposal sites other than Bridgeport.  The district court granted the motion, holding the other-site evidence more prejudicial than probative and unduly time consuming.

After a three week trial, the jury found that Chemical Leaman was entitled to coverage for damage to the soil and wetlands under the April 1, 1960 to April 1, 1971 policies, and to coverage for damage to the groundwater under the April 1, 1960 to April 1, 1981 policies.  In reaching its verdict, the jury answered detailed interrogatories on Chemical Leaman's intent and expectation to cause property damage and to discharge pollutants during each policy year.  After oral argument before this Court, Chemical Leaman and Aetna settled all claims arising from this dispute.  The LMI now appeals the district court's legal determinations and the jury's verdict.

We have jurisdiction to review the final judgment of the district court under 28 U.S.C.  1291.  The district court held New Jersey law governs, which the parties do not dispute. Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 788 F. Supp. at 851.  As a federal court sitting in diversity, we must apply the substantive law of New Jersey.  Borse v. Pierce Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992).  Our review of the district court's interpretation of New Jersey law is plenary. Wiley v. State Farm  Fire & Cas. Co., 995 F.2d 457, 459 (3d Cir. 1993).

III. Occurrence-Based Insurance Policies
and "Expected or Intended"

Chemical Leaman purchased "occurrence-based" comprehensive general liability insurance from the LMI that provided coverage for "[a]n accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . property damage."  The LMI contend that because Chemical Leaman "expected" or "intended" to cause property damage at the Bridgeport site, the policies do not provide coverage.

New Jersey courts have been called upon repeatedly to interpret the "expected/intended" clause in occurrence-based insurance policies.  They have sought to balance the need to compensate victims against the public policy of deterring intentional wrongdoing by denying coverage for its consequences. In companion cases, Voorhees v. Preferred Mut. Ins. Co., 607 A.2d 1255 (N.J. 1992), and SL Industries, Inc. v. American Motorists Ins. Co., 607 A.2d 1266 (N.J. 1992), the New Jersey Supreme Court addressed how the "expected/intended" clause should be interpreted in order to strike the correct balance.

In Voorhees, the New Jersey Supreme Court held the accidental nature of an occurrence is determined by analyzing whether the insured subjectively intended or expected to cause an injury.  Voorhees v. Preferred Mut. Ins. Co., 607 A.2d at 1264. The court explained:

That interpretation prevents those who

> intentionally cause harm from unjustly
> benefitting from insurance coverage while
> providing injured victims with the greatest
> chance of compensation consistent with the
> need to deter wrong-doing. It also accords
> with an insured's objectively-reasonable
> expectation of coverage for unintentionally-
> caused harm.

Id. at 1264. The court emphasized, "[e]ven when the actions in question seem foolhardy and reckless, the courts have mandated an inquiry into the actor's subjective intent to cause injury." Id.

The court also recognized an "exceptional circumstances" exception to the subjective intent inquiry.

> When the actions are particularly
> reprehensible, the intent to injure can be
> presumed from the act without an inquiry into
> the actor's subjective intent to injure.
> That objective approach focuses on the
> likelihood that an injury will result from an
> actor's behavior rather than on the
> wrongdoer's subjective state of mind.

Id. at 1265. The court cited to sexual assault against children as an example of an act that is "so inherently injurious" that an intent to injure can be presumed. Id.

In SL Industries, the court confronted the question "whether any intent to injure will render the resulting injury intentional [and preclude coverage], whether the wrongdoer must intend the specific injury that results, or whether there is some middle ground between the two approaches." SL Industries, Inc. v. American Motorists Ins. Co., 607 A.2d at 1277 (emphasis in original). After evaluating alternative theories, the court adopted the "middle ground," which it summarized as follows:

> Assuming the wrongdoer subjectively intends
> or expects some sort of injury, that intent
> will generally preclude coverage. If there
> is evidence that the extent of the injuries
> was improbable, however, then the court must
> inquire as to whether the insured
> subjectively intended or expected to cause
> that injury. Lacking that intent, the injury
> was "accidental" and coverage will be
> provided.

Id. at 1278. SL Industries involved an allegation of intentional fraud that "presupposes a general subjective intent to injure." Accordingly the New Jersey Supreme Court remanded the cases for a determination of whether the injury suffered by the victim was improbable, and if so, whether the insured intended or expected the victim's actual injuries. Id. at 1279. The court noted this approach "conforms to an insured's objectively-reasonable expectations and provides the victim the greatest possibility of additional compensation consistent with the goal of deterring intentional wrongdoing." Id.

The New Jersey Supreme Court addressed the expected/intended clause of comprehensive general liability

policies in the environmental pollution context in Morton
Intern., Inc. v. General Acc. Ins. Co., 629 A.2d 831 (N.J. 1993),
cert. denied, 114 S. Ct. 2764 (1994). It attempted to apply the
principles established in Voorhees and SL Industries, but was
forced to "acknowledge the impracticality of adherence to the
general rule that `we will look to the insured's subjective
intent to determine intent to injure.'" Id. at 879. The court
then elaborated upon Voorhees' "exceptional circumstances"
exception, which allows an intent to injure to be presumed
without inquiry into the actor's subjective intent.

> [W]e hold that in environmental-coverage
> litigation a case-by-case analysis is
> required to determine whether, in the context
> of all the available evidence, "exceptional
> circumstances exist that objectively
> establish the insured's intent to injure."
> Voorhees, 607 A.2d at 1265. Those
> circumstances include the duration of the
> discharges, whether the discharges occurred
> intentionally, negligently, or innocently,
> the quality of the insured's knowledge
> concerning the harmful propensities of the
> pollutants, whether regulatory authorities
> attempted to discourage or prevent the
> insured's conduct, and the existence of
> subjective knowledge concerning the
> possibility or likelihood of harm.

Id. at 879-80. The court cautioned, "insureds held responsible
for remediation of environmental pollution vary significantly in
their degree of culpability for the harm caused by pollutant
discharges." Therefore, "[a] general rule in environmental-
pollution coverage litigation that would permit intent to injure
to be presumed simply on the basis of a knowing discharge of
pollutants would be unjustified." Id. at 879.

The New Jersey Supreme Court applied the factors it had
outlined to determine whether "exceptional circumstances"
supported the presumption of an intent to cause property damage.
It noted Morton and predecessors had polluted Berry's Creek to
such an extent that "[f]or a stretch of several thousand feet,
the concentration of mercury . . . [was] the highest found in
fresh water sediments in the world." Id. at 834. This damage
was caused by the discharge of pollutants from a mercury-
processing plant over a period of at least eighteen, and perhaps
as many as forty-five, years. Id. at 882. Moreover, for at
least eighteen years the discharges had been intentional, even
though the company knew they would cause environmental harm.
Despite repeated complaints by regulatory agencies, Morton
engaged in "a pattern of `stonewalling' . . . characterized by
promises of compliance that consistently were unfulfilled." Id.
On the basis of these facts, the court held, it "would have
ignored reality to conclude that [Morton's] predecessors did not
know that the mercury and its effluents was [sic] harmful to the
land over which it coursed and the waters into which it fell."
Id. at 884. Therefore, it held as a matter of law that the

property damage was not caused by an "occurrence" within the meaning of the applicable insurance policies.

Morton's presumption of an insured's subjective intent to cause property damage from egregious circumstances does not hinge on whether the insured should have expected or intended to cause injury. This would be akin to a negligence standard. If negligent acts did not fall within the definition of a covered occurrence, then there would be no point in purchasing comprehensive general liability insurance. Pittston Co. v. Allianz Ins. Co., 905 F. Supp. 1279, 1301 (D.N.J. 1995). While Morton pragmatically acknowledges courts should not "ignore reality" when exceptional circumstances establish the insured's subjective intent to injure, the insured's subjective intent to cause injury remains the relevant inquiry under the occurrence language.

In Morton, the New Jersey Supreme Court also addressed the applicability of SL Industries' improbability rule in environmental pollution coverage litigation. It explained:

> Turning to the question of whether environmental injury was intended or expected, we first observe that although the magnitude of damage to Berry's Creek and the surrounding areas may exceed any intention or expectation attributable to Morton's predecessors, we do not consider differences in harm relating to severity of environmental damage give rise to a finding of "improbability" of harm that invokes the need for evidence of subjective intent. SL Industries, supra. . . . The holding of SL Industries was based on the Appellate Division's ruling . . . that in a coverage action arising from a fight between two young teenagers in which one sustained a broken hip, a factual issue was presented because of the inherent improbability that the skirmish would result in a hip fracture. No such inherent "improbability" can be ascribed to the environmental damage attributable to Morton's predecessors.

Morton Intern., Inc. v. General Acc. Ins. Co., 629 A.2d at 882 (citations omitted). Therefore the court concluded it did not have to inquire into Morton's subjective intent to cause the specific environmental damage at issue.

In this case, the district court interpreted New Jersey law on the "expected/intended" clause before the New Jersey Supreme Court's decision in Morton. Nevertheless, it instructed the jury to determine whether Chemical Leaman subjectively expected or intended to cause property damage at the Bridgeport site. At the end of trial, on the LMI's Rule 50(a) motion for judgement as a matter of law, the district court found that the harm to the environment caused by the Bridgeport water treatment system was improbable as a matter of law. The district court also held Chemical Leaman's actions were not so reprehensible as

to justify the presumption of an intent to cause property damage under the "exceptional circumstances" exception. It concluded Chemical Leaman was not "throwing toxic waste out into the meadow-lands" as Morton and its predecessors had done; rather, it had "designed and built the facility to prevent [harm to the environment]." Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F. Supp. at 1146.

On appeal, the LMI argue the district court's jury instructions on the expected/intended issue were erroneous and inconsistent with New Jersey law. They also assert the harm at the Bridgeport site was not improbable as a matter of law. Finally, they contend "exceptional circumstances" objectively establish Chemical Leaman's intent to cause property damage. Our review of jury instructions is plenary. See Hook v. Ernst & Young, 28 F.3d 366, 370 (3d Cir. 1994). A jury charge, taken as a whole, must "fairly and adequately" submit the issues in the case to the jury. Id.

A. Jury Instruction on Expected/Intended

The district court instructed the jury that it should find for Chemical Leaman if Chemical Leaman did not subjectively expect or intend damage to the soil, groundwater, or wetlands at the Bridgeport site. Midway through the trial, the court instructed the jury:

> There are three kinds of damage at issue in this case--soil contamination, groundwater contamination, and swamp contamination . . . You must evaluate Chemical Leaman by what you believe were its actual, subjective expectations or intentions with regard to causing soil, groundwater and swamp damage . . .

At the end of the trial, the district court again instructed the jury:

> "EXPECTED OR INTENDED" -- FOCUS ON DAMAGE
>
> In determining Chemical Leaman's expectations and intentions in the context of basic coverage, you are instructed to focus on whether the specific property damage was expected or intended. You are not to consider whether the acts which caused that property damage were intentional acts. I give you this instruction because it is New Jersey law the unintended results of intentional acts may be covered by defendants' insurance policies. Thus, even though Chemical Leaman may have knowingly and intentionally committed the acts that ultimately led to the environmental damage at the Bridgeport site, there still may be insurance coverage as long as you find that Chemical Leaman did not expect or intend the specific property damage that is the subject matter of this litigation, namely the

contamination of the soil, groundwater, or wetlands.

"EXPECTED OR INTENDED" -- SPECIFIC DAMAGE STANDARD

I further instruct you that, in deciding whether Chemical Leaman subjectively expected or intended to cause property damage, you must consider whether Chemical Leaman subjectively expected or intended the very damage that is the subject matter of this case. Thus, it is not sufficient for you to find that Chemical Leaman expected or intended any injury -- such as injury to the environment generally. Rather, you must determine whether Chemical Leaman expected or intended the actual property damage that it is now required to clean-up.

In addition, special interrogatories were submitted to the jury on Chemical Leaman's expectation and intention to cause damage to the soil, groundwater, and wetlands.

The LMI contend the district court's final jury instruction was erroneous because it instructed the jury "to focus on whether the specific property damage"--namely contamination to the soil, groundwater, or wetlands--"was expected or intended." They argue the district should have instructed the jury that if Chemical Leaman "expected or intended" to cause some injury to the environment generally, then coverage was precluded unless the extent of the injury was improbable. The LMI rely on SL Industries, in which the New Jersey Supreme Court stated:

Assuming the wrongdoer subjectively intends or expects some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was "accidental" and coverage will be provided.

SL Industries, Inc. v. American Motorists Ins. Co., 607 A.2d at 1278. The LMI contend Chemical Leaman intended to cause some injury because Chemical Leaman knew the rinsewater contained contaminants, and knew the contaminants would seep into the soil when deposited in the containment ponds. They assert Chemical Leaman also knew discharges from the overflow pipe would drain into the swamp. Therefore, they argue, Chemical Leaman intended "some sort of injury" as a matter of law, and coverage was precluded unless the extent of injury was improbable.

Although the LMI's argument possesses a certain appeal, we believe the New Jersey Supreme Court would reject it. An insured who intentionally discharges a known pollutant generally intends "some sort of harm," however de minimis, and the harm

that actually results is usually a probable result of the discharge. Accordingly, the LMI's reading of SL Industries would result in a general rule precluding coverage based on the knowing discharge of a pollutant. But in Morton Intern., Inc. v. General Acc. Ins. Co., 629 A.2d at 879-80, the New Jersey Supreme Court held "a general rule . . . [precluding coverage] simply on the basis of a knowing discharge of pollutants would be unjustified." The LMI's reading of SL Industries' "some sort of injury" language conflicts with Morton.

Moreover, in SL Industries, the New Jersey Supreme Court confronted the problem of insurance coverage for injury caused by intentional, tortious conduct, namely intentional fraud. But intentional tort cases are an imperfect analogy in the context of environmental pollution. The insured who commits an intentional tort like fraud possesses some knowledge of the nature of the harm likely to result and intends to cause such harm. Also, most intentional torts are committed in a single, discrete, and temporally limited incident. In the context of environmental pollution, the insured's knowledge concerning the harmful propensities of pollutants and the likelihood of harm to the environment may be less complete and may vary significantly over time. For example, it is a matter of historical fact that many insureds, acting in accordance with standard industry practices, intentionally discharged pollutants into unlined containment ponds or other inadequate waste treatment systems, but were unaware that groundwater damage would eventually result.

In Morton, the New Jersey Supreme Court acknowledged the unsuitability of prior case law on the expected/intended provision in environmental pollution coverage litigation. Morton, 629 A.2d at 879 ("In applying our holding in Voorhees to claims seeking coverage for property-damage caused by environmental pollution under occurrence-based CGL policies, we acknowledge the impracticality of adherence to the general rule that `we will look to the insured's subjective intent to determine intent to injure.'"). We believe the New Jersey Supreme Court would similarly reject a wooden application of SL Industries' "some sort of injury" language, and would instead look to the general principles underlying the interpretation of insurance-policy provisions involving intentional conduct. As stated by the New Jersey Supreme Court:

> Our goal is to interpret the insurance
> provisions in light of the insured's
> objectively reasonable expectations. . . .
> [W]e must attempt to reconcile two goals:
> that of deterring intentional wrongdoing by
> precluding insurance indemnification, and
> that of providing victims with compensation
> to the extent that compensation will not
> interfere with deterring injurious behavior.

SL Industries, Inc. v. American Motorists Ins. Co., 607 A.2d at 1278. We will apply these principles in this case.

In the environmental pollution context, the insured's appreciation of the magnitude and nature of harm likely to be caused by a discharge of pollutants is relevant in determining

whether insurance coverage should be precluded.

> When the injury caused significantly exceeds the injury intended or expected . . . then it is hard to characterize the injury as truly "intentional." . . . Moreover, if the tortfeasor did not intend or expect to cause the resulting harm, denying coverage will not deter the harmful conduct. In that case, there is no policy justification for denying the victim the possibility of additional compensation.

*SL Industries, Inc. v. American Motorists Ins. Co.*, 607 A.2d at 1278. If an insured does not understand the causal connection between the discharge of a pollutant and the property damage that results, deterrence is not served by precluding insurance coverage. Moreover, where an insured does not intend or expect property damage of a particular nature to result from its discharge of pollutants, the insured has an "objectively reasonable expectation" of coverage should such property damage later manifest itself. For these reasons, we cannot agree with the LMI's contention that some intent to cause any sort of environmental harm will preclude insurance coverage for all environmental harm under New Jersey law. Rather we believe the New Jersey Supreme Court would inquire into the insured's intent or expectation to cause environmental harm of a particular sort, for example, whether the insured intended damage to the soil, groundwater, or wetlands. Where the insured intends or expects such harm, coverage is precluded, unless, of course, the injury was improbable. On the other hand, an insured's intent to cause environmental harm of one sort will not preclude coverage for other kinds of unintended and unexpected environmental harm. For example, an insured's intent to cause soil damage will not preclude coverage for unintended and unexpected damage to the groundwater or wetlands.

The district court's jury instruction fairly and adequately asked the jury to consider whether Chemical Leaman expected or intended injury to the soil, groundwater, or wetlands. The instruction also allowed the jury to consider the nature and extent of Chemical Leaman's knowledge regarding the likelihood of harm as that knowledge evolved over time. There was ample evidence supporting the jury's conclusion that Chemical Leaman did not expect or intend to cause property damage. Chemical Leaman presented evidence that it believed the system of unlined ponds would cleanse contaminated rinsewater. Although Chemical Leaman intentionally discharged known pollutants, a reasonable jury could find, and the jury here did find, Chemical Leaman did not expect or intend damage to the soil, groundwater or wetlands. In light of the jury's findings, Chemical Leaman is entitled to insurance coverage for the costs of clean-up of environmental damage. Because Chemical Leaman did not expect or intend damage to the soil, groundwater, or wetlands, we need not inquire whether the property damage at the Bridgeport site was an improbable result of Chemical Leaman's actions.

B. The "Exceptional Circumstances" Exception

The LMI contend that under Voorhees' "exceptional circumstances" exception, Chemical Leaman's intent to cause property damage should be presumed as a matter of law.

As we have noted, in Morton the New Jersey Supreme Court set forth several factors to be considered in evaluating whether exceptional circumstances exist. These include:

> the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.

Morton Intern., Inc. v. General Acc. Ins. Co., 629 A.2d at 879–80. We believe the New Jersey Supreme Court designed the "exceptional circumstances" exception to apply only to egregious conduct. This much is apparent from the court's use of child sexual abuse as an illustration of conduct that is "so inherently injurious" as to warrant a presumption of intent to injure. Id.at 879. Because "insureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges," we believe "[a] general rule in environmental–pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified." Id. at 879–880.

Instead Morton mandates "a case-by-case analysis . . . in order to determine whether, in the context of all the available evidence, exceptional circumstances exist." Id. Morton is instructive in considering the level of culpability required to allow intent to injure to be presumed in the environmental context. In Morton, the insured intentionally discharged mercury–laden compounds directly into streams over a lengthy period of time. The Department of Health and state engineers made repeated demands for compliance and the insured consistently disregarded its own promises to remediate the discharge. Morton, 629 A.2d at 882. "[T]he record fairly reflect[ed] a pattern of `stonewalling' on the part of [the insured], characterized by promises of compliance that consistently were unfulfilled." Id.

We believe a reasonable jury could find Chemical Leaman did not engage in a "pattern of stonewalling." On the contrary, a jury could conclude that Chemical Leaman's behavior suggests a good faith effort at compliance with agency demands. Chemical Leaman initially designed the Bridgeport wastewater treatment system to purify contaminated rinseate in 1960. The designers of the system believed that the sandy bottom of the unlined ponds would purify the contaminated rinsewater by acting as a natural filter, and the overflow pipe was intended as a safety valve to prevent a rupture in the berms of the containment ponds in the event of heavy rain. When an inspector from the Pollution Unit

of the New Jersey Division of Fish, Game & Wildlife advised Chemical Leaman of an unsatisfactory discharge into a neighboring swamp in September 1961, Chemical Leaman responded by constructing a second set of lagoons and the final settling lagoon. Seven years later, water pollution inspectors from the New Jersey Department of Health concluded discharges from the lagoon were pollutional and, in February 1969, ordered Chemical Leaman to submit plans for a system to properly treat the effluent. In May 1969, Chemical Leaman submitted a plan for a new rinsewater treatment system. The New Jersey Department of Health rejected this plan and over the next four years the parties attempted to resolve their dispute until January 1974, when they entered into a consent judgment. This history can hardly be described as "a pattern of `stonewalling' . . . characterized by promises of compliance that consistently were unfulfilled." Morton, 629 A.2d at 882. Accordingly, "exceptional circumstances" do not exist here that would permit a presumption of Chemical Leaman's subjective intent to cause property damage.

### IV. Pollution Exclusion Clauses

The April 1, 1971 to April 1, 1985 LMI policies contained pollution exclusion clauses barring coverage for discharges of pollutants, unless such discharges were "sudden and accidental" or "sudden, unintended, and unexpected." The LMI argued to the district court that coverage was precluded because the discharge of pollutants at the Bridgeport site was not "sudden." The district court rejected the LMI's argument, relying on a line of New Jersey cases beginning with Broadwell Realty Serv., Inc. v. Fidelity & Cas. Co., 528 A.2d 76 (N.J. Super. App. Div. 1987). It held the word "sudden" is ambiguous-- sometimes carrying a temporal meaning and sometimes meaning "unexpected"--and should not be interpreted to exclude coverage for environmental harm caused by gradual discharges over a prolonged period. It concluded, "[t]he pollution exclusion precludes coverage when the insured has caused the discharge of pollutants, unless the discharge was neither expected nor intended from the standpoint of the insured." Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F. Supp. at 1157. The district court then granted partial summary judgment to the insurers with respect to soil damage because Chemical Leaman intended to discharge contaminants into the soil. At trial, the jury found Chemical Leaman expected and intended discharges to the swamp, but not to the groundwater. On appeal, the LMI contest their liability for groundwater damage.

Subsequent to the district court's decision, the New Jersey Supreme Court addressed the standard form pollution exclusion clause in Morton Intern., Inc. v. General Acc. Ins. Co., 629 A.2d at 847-76. The New Jersey Supreme Court expressly overruled Broadwell, because it believed that the word "sudden" was not ambiguous. It held "`sudden' possesses a temporal element, generally connoting an event that begins abruptly or without prior notice or warning," and concluded that "the phrase `sudden and accidental' in the standard pollution-exclusion clause describes only those discharges, dispersals, releases, and

escapes of pollutants that occur abruptly or unexpectedly and are unintended."  Id. at 847.  Nevertheless, the court refused to enforce the standard pollution exclusion as written because it found the insurance industry had misled state regulators in securing its approval.  Instead, the court held the pollution exclusion clause precludes coverage if the insured intentionally discharges a known pollutant, regardless of whether the insured expected or intended to cause property damage:

> [W]e perceive that regulators would reasonably have understood the effect of the clause to have denied coverage for the intentional discharge, dispersal, release, or escape of known pollutants, whether or not the eventual damage was intended or expected from the standpoint of the insured.  The industry's presentation of the clause to regulators described it as a clarification of the "intended and expected" clause of the basic "occurrence" definition "so as to avoid any question of intent," and could fairly be understood as an attempt to override the issue whether damage was intended by excluding coverage for intentional discharges of known pollutants.  Accordingly, we construe and give effect to the standard pollution-exclusion clause only to the extent that it shall preclude coverage for pollution-caused property damage caused by an "occurrence" if the insured intentionally discharged, dispersed, released, or caused the escape of a known pollutant.

Id. at 848 (emphasis in the original).

On appeal, the LMI contend the district court incorrectly instructed the jury that the pollution exclusion clause precludes coverage only if Chemical Leaman intentionally discharged known pollutants into the groundwater.  First, the LMI argue Morton established that the word "sudden" has a temporal connotation--meaning "abrupt"--and precludes coverage for gradual discharges, dispersals, releases, or escapes.  Because Chemical Leaman discharged contaminated rinsewater over a prolonged period, they argue, coverage should be precluded.  The LMI acknowledge Morton's regulatory estoppel holding generally prevents enforcement of the "sudden" requirement, but assert Morton does not apply to the LMI because (1) several of their policies contain the non-standard NMA 1685 pollution exclusion, and (2), they were not party to the misrepresentations made to regulatory authorities.  Second, the LMI argue that even if Morton's regulatory estoppel holding applies, the pollution exclusion clause bars coverage because Chemical Leaman intentionally discharged known pollutants.  They argue the district court erred in requiring proof that Chemical Leaman intended discharge into the groundwater, as opposed to into the environment generally.

A.  Regulatory Estoppel

### 1. Non-Standard Pollution Exclusion

In Morton, the New Jersey Supreme Court applied regulatory estoppel to the ISO standard pollution exclusion clause and did not address coverage issues relating to non-standard pollution exclusion clauses. Morton Intern., Inc. v. General Acc. Ins. Co., 629 A.2d at 881. The LMI argue that Morton's regulatory estoppel holding should not prevent enforcement of the term "sudden" in the non-standard NMA 1685 pollution exclusion clause contained in certain of their policies. We believe this argument lacks merit. Both the ISO standard pollution exclusion and the non-standard NMA 1685 pollution exclusion use the term "sudden." The NMA 1685 exclusion closely tracks the language of the standard pollution exclusion, and both pollution exclusion clauses came into use at about the same time. Indeed, the LMI argue the NMA 1685 exclusion and the standard exclusion are identical in scope because both exclude coverage for non-abrupt, non-sudden discharges and releases of pollutants. See also Potomac Elec. Power Co. v. California Union Ins. Co., 777 F. Supp. 968, 978 n.23 (D.D.C. 1991) (defendant insurers admit there is "no material difference" between standard pollution exclusion and NMA 1685 pollution exclusion). The New Jersey Supreme Court refused to enforce the term "sudden" in Morton because the insurance industry mislead state regulators as to its effect when obtaining approval for the standard pollution exclusion clause. We do not believe the New Jersey Supreme Court would enforce the term "sudden" in non-standard pollution exclusion clauses simply because other language in those clauses varies slightly from that in the standard pollution exclusion. Therefore we conclude that Morton's regulatory estoppel holding applies to the NMA 1685 pollution exclusion as well as the standard pollution exclusion.

### 2. Application of Regulatory Estoppel to the LMI

The LMI also argue that Morton's regulatory estoppel holding should not be applied to them because they did not affirmatively deceive New Jersey regulators in securing approval of the standard pollution exclusion. We cannot agree. The LMI's policies contained the standard pollution exclusion precluding coverage for non-sudden discharges or releases of pollutants. They also contained the NMA 1685 pollution exclusion, which closely parallels the language of the standard exclusion. Approval of the standard pollution exclusion clause was secured through misrepresentations to regulatory authorities. Regardless of whether the LMI themselves directly misrepresented the effect of the term "sudden" in the pollution exclusion clauses, they benefitted from the misleading explanation of the effect of the standard pollution exclusion submitted to state regulators by insurance industry trade groups. The LMI did not independently submit information to New Jersey regulators or attempt to explain the full impact of the term "sudden" in the pollution exclusion clauses they used. Under these circumstances, we believe the New Jersey Supreme Court would not enforce the term "sudden" in the policies issued by the LMI.

### B. Intentional Discharge

The LMI also argue the district court should not have

required separate findings with regard to intent to discharge into the soil, wetlands, and groundwater. They contend that if Chemical Leaman intended any discharge, whether to the soil, groundwater, or wetlands, then the pollution exclusion clauses preclude coverage for all property damage arising from that discharge. Because the district court granted partial summary judgment to the insurers with respect to discharges into the soil, the LMI argue, the district court should also have denied coverage for all resulting property damage, including groundwater damage. The effect of the LMI's argument would be to require judgment in their favor as a matter of law on all policies containing a pollution exclusion. The LMI raised this argument before the district court in a Rule 50(b) motion. The district court refused to consider the argument because the LMI had not raised it in their prior Rule 50(a) motion. Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., No. 89-1543, slip op. at 4 (D.N.J. November 8, 1993).

Motions for judgment as a matter of law must be made before submission of the case to the jury and must "specify the judgment sought and the law and facts on which the moving party is entitled to judgment" under Fed. R. Civ. P. 50(a)(2). We have reviewed the portions of the record cited to by the LMI in their brief, and conclude that the LMI did not specify the "law and facts" entitling them to judgment in their summary judgment motion, their Joint Trial Brief, or their Rule 50(a) motion before the district court. The LMI assert they adequately raised the argument because they objected to the district court's jury instruction on the pollution exclusion clauses, stating:

> There was one other thing with respect to the pollution exclusion. Just to be perfectly clear. It's not my understanding that the law even where it does not recognize a temporal element for the sudden. It is not required that there be an intent or an expectation to discharge a particular medium, rather it's the discharge itself and where it goes. This should not be the subject of the deliberation of the jury.

An objection to a jury charge can serve as a predicate for a later Rule 50(b) motion only if the district court explicitly treated the objection as a Rule 50(a) motion. Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 814-15 (3d Cir. 1984) ("A request for jury instructions may suffice to fulfill the requirement that a motion for a directed verdict be made before granting a JNOV only if it is clear the district court treated the request as a motion for a directed verdict and ruled on it as such."), cert. denied, 477 U.S. 908 (1986); Lowenstein v. Pepsi-Cola Bottling Co. of Pennsauken, 536 F.2d 9, 11 (3d Cir.) (same), cert. denied, 429 U.S. 966 (1976). The district court did not treat the LMI's objection to the jury charge as a Rule 50(a) motion. Accordingly, we believe the district court correctly declined to hear the LMI's argument on their Rule 50(b) motion.

"It is clear under our jurisprudence that this court

cannot reverse the district court's decision denying [a] Rule 50(b) motion for j.n.o.v. on the basis of an argument the [a party] failed to raise in support of its predicate Rule 50(a) motion for a directed verdict." Simmons v. City of Philadelphia, 947 F.2d 1042, 1077 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992); see also Lightning Lube, Inc. v. Witco. Corp., 4 F.3d 1153, 1172 (3d Cir. 1993) ("In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgement as a matter of law at the close of the nonmovant's case, pursuant to Rule 50(a), and specify the grounds for that motion."). The LMI did not raise their argument in their Rule 50(a) motion. Therefore we will not address it on appeal.

We believe the LMI's objection to the district court's jury instruction was also insufficient to preserve their argument for appeal under Fed. R. Civ. P. 51. In order to preserve an objection to a jury instruction, a party must "object[] thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51. The purpose of Rule 51 is to "afford the trial judge an opportunity to correct the error in her charge before the jury retires to consider its verdict and to lessen the burden on appellate courts by diminishing the number of rulings at the trial which they may be called on to review." Dunn v. HOVIC, 1 F.3d 1371, 1379 (3d Cir.) (in banc), modified, 13 F.3d 58, and cert. denied, 114 S. Ct. 650 (1993). We believe the LMI's objection did not identify the issue they now argue on appeal with sufficient clarity to give the trial judge notice of a possible error in the instruction. Not only was the objection difficult to understand because of its convoluted grammar, but the objection did not specify the authority upon which it was based. Therefore the LMI's objection failed to comply with Rule 51's requirement that an objection "stat[e] distinctly . . . the grounds of the objection" and did not preserve the LMI's argument for appeal. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir), ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."), cert. denied, 494 U.S. 1082 (1990).

"In the absence of a party's preservation of an assigned error for appeal, we review for plain error, and our power to reverse is discretionary." Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1289 (3d Cir. 1995). Particularly in the civil context, we exercise our power to reverse for plain error sparingly. Id.; see also United States v. Carson, 52 F.3d 1173, 1188 (2d Cir. 1995) ("plain error review is only appropriate in the civil context where the error is so serious and flagrant that it goes to the very integrity of the trial."), cert. denied, 116 S. Ct. 934 (1996). Because we do not believe any mistake in the district court's jury instructions on the pollution exclusion clause was so fundamental as to amount to plain error, we decline to exercise our discretion to reverse.

V.  Other-Site Evidence

Before trial, Chemical Leaman made a motion in limineto exclude evidence relating to environmental problems at other tank truck cleaning facilities it operated.  The district court granted this motion under Federal Rule of Evidence 403 because it found the probative value of the evidence substantially outweighed by the danger of unfair prejudice, jury confusion, and undue waste of time.  Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., No. 89-1543, slip op. at 4-5 (D.N.J. March 17, 1993).

The LMI argue the district court abused it discretion in excluding evidence of environmental pollution at other Chemical Leaman cleaning facilities.  They contend the evidence from other sites tended to establish Chemical Leaman knew its system of unlined ponds at Bridgeport would cause property damage, including harm to the groundwater.  They also insist that such evidence should have been allowed to impeach the testimony of Harry Elston, the designer of all Chemical Leaman's waste treatment facilities, even if not allowed in their case-in-chief. We review the district court's rulings on the admissibility of evidence for an abuse of discretion.  See Tait v. Armor Elevator Co., 958 F.2d 563, 568 (3d Cir. 1992).

The district court noted the evidence the LMI sought to introduce had limited probative value because its relevance depended upon an extended chain of reasoning linking it to the Bridgeport site:

> the jury would have to evaluate the various explanations offered by Chemical Leaman on why its knowledge of alleged problems at other sites did not translate into an expectation or intention that the rinsewater treatment system in Bridgeport would cause damage.  These explanations include, among others, whether damage actually occurred at the other sites; and whether the geological and other conditions at the other sites were significantly different or substantially the same as at Bridgeport. . . . [T]he probative value of the proffered other site evidence is remote because it necessarily depends upon these intermediate findings.

Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., No. 89-1543, slip op. at 4-5 (D.N.J. March 17, 1993). The district court believed that for the jury properly to evaluate this evidence, a series of mini-trials relating to each site would have been required.  Such mini-trials, the court concluded, would cause undue delay and mislead and confuse the jury as to the ultimate factual issue, namely Chemical Leaman's subjective intent to cause harm at the Bridgeport site.  Id.  Moreover, the district court held that the other site evidence carried with it a significant danger of unfair prejudice.  On the basis of such evidence, the court noted, the jury might have ignored New Jersey law on the insured's subjective intent and applied an objective test assessing whether "Chemical Leaman should have known that its rinsewater treatment system would cause damage."  Id.

In light of the district court's balancing of the probative value of the proffered evidence against its prejudicial effect and the potential for jury confusion and delay, we cannot say the district court abused its discretion in excluding the other site evidence.

## VI.  Continuous Trigger

The New Jersey Supreme Court adopted the "continuous trigger" theory to identify the time of an "occurrence" in Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d 974 (N.J. 1994).  The continuous trigger theory recognizes that "when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy."  Id. at 995.

> The conceptual underpinning of the
> continuous-trigger theory, then, is that
> injury occurs during each phase of
> environmental contamination--exposure,
> exposure in residence (defined as further
> progression of environmental injury even
> after exposure has ceased), and manifestation
> of disease.

Id. at 981.

In Owens-Illinois, the New Jersey Supreme Court also addressed the allocation of losses between multiple insurers and the insured when the continuous trigger theory establishes an occurrence in several different policy years.  It held "[a] fair method of allocation appears to be one that is related both to the time on the risk and the risk assumed," id. at 995, "i.e., proration on the basis of policy limits, multiplied by years of coverage," id. at 993.

Owens-Illinois involved a suit for personal injuries resulting from exposure to asbestos, but the New Jersey Supreme Court made clear the continuous trigger theory extends to property damage claims resulting from long-term environmental contamination.  It concluded, "[p]roperty-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos.  Like a person exposed to toxic elements, the environment does not necessarily display the harmful effects until long after the initial exposure."  Id. at 983; see also Astro Pak Corp. v. Fireman's Fund Ins. Co., 665 A.2d 1113, 1117 (N.J. Super. App. Div.) (same), certif. denied, 670 A.2d 1065 (N.J. 1995).

Although considering the issue before the New Jersey Supreme Court's decision in Owens-Illinois, the district court applied the continuous trigger theory, ruling all of the LMI's policies from 1960 through 1985 had been triggered by the environmental contamination at the Bridgeport site, unless a policy exclusion barred coverage.  Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F. Supp. at 1153-54.  The district court also held that all insurance policies activated by a continuing occurrence are jointly and severally liable to policy limits for property damage resulting from the occurrence.

Id.

On appeal, the LMI contend the New Jersey Supreme Court would not recognize the continuous-trigger theory. In light of the intervening decision in Owens-Illinois, this argument is meritless. On the other hand, the LMI correctly dispute the district court's holding that all policies are jointly and severally liable under the continuous trigger theory. Because the New Jersey Supreme Court rejected joint and several liability in favor of a risk-based allocation of liability among applicable insurance policies in Owens-Illinois, we will remand this matter to the district court for a reallocation of liability between the insurers and among the triggered policies in accordance with Owens-Illinois.

The LMI also contend that Chemical Leaman failed to prove property damage occurred during each policy year from 1960-70, and therefore the district court erred in finding as a matter of law that property damage occurred in the 1960-61 policy year, and in denying their summary judgement motion with respect to the 1961-70 policy years. Under the continuous trigger theory, exposure to the harm causing agent is sufficient to trigger potential coverage. Actual manifestation of the injury is not required, so long as there is a continuous, indivisible process resulting in damage. Owens-Illinois, Inc. v. United Ins. Co., 650 A.2d at 981 ("injury occurs during each phase of environmental contamination--exposure, exposure in residence . . . and manifestation of disease"); Morrone v. Harleysville Mut. Ins., 662 A.2d 562, 564 (N.J. Super. App. Div. 1995) (exposure to gasoline sufficient to trigger occurrence). It is undisputed that Chemical Leaman discharged contaminated rinsewater into the unlined ponds and lagoons in every year from 1960-70. Moreover, the district court found as a factual matter that "contaminated rinsewater from the three settling ponds started migrating through the soil to underlying groundwater almost immediately after beginning pond operation in 1960." Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F. Supp. at 1148. Accordingly, the district court correctly concluded as a matter of law that property damage occurred upon initial exposure in 1960, and should have concluded as a matter of law that property damage occurred in each policy period from 1961-70. The LMI, of course, were not prejudiced by the district court's error.

Finally, the LMI assert the district court incorrectly instructed the jury on the meaning of "property damage" in the underlying policies. Specifically, they object to the instruction that "Chemical Leaman may be entitled to coverage under the defendants' insurance policies for property damage that occurs during a policy period, but that originally began during an earlier policy period." They argue Chemical Leaman was required to prove "actual injury" during each policy period, and the jury incorrectly equated exposure to pollutants with property damage. Under the continuous trigger theory, proof of actual injury in the sense of manifestation of injury is not required. The jury could find property damage occurred during a policy period so long as there is proof that a continuous, indivisible process of injury occurred during that period. The district

court's jury charge was not erroneous.

### VII.  Late Notice

Chemical Leaman failed notify its insurers of its claim relating to the Bridgeport facility until 1988, four years after it entered into a consent decree with the EPA admitting liability under CERCLA, and even longer after the underlying events that harmed the environment.  The LMI assert this failure violated the notice provisions of the policies and relieves them from any obligation to provide insurance coverage.

An insurer that seeks to disclaim coverage based upon untimely notice from its insured under an occurrence-based policy must demonstrate that it has suffered "appreciable prejudice." Cooper v. Government Employees Ins. Co., 237 A.2d 870 (N.J. 1968); Med. Inter Ins. Exchange v. Health Care Ins. Exchange, 651 A.2d 1029, 1033 (N.J. Super. App. Div.), certif. denied, 658 A.2d 728 (N.J. 1995).  Lower courts in New Jersey have identified two relevant factors in determining whether an insurer has suffered prejudice justifying a denial of coverage:  "whether substantial rights have been irretrievably lost by virtue of the failure of the insured to notify the carrier in a timely fashion," Morales v. National Grange Mut. Ins. Co., 423 A.2d 325, 329 (N.J. Super. Law Div. 1980), and whether "the likelihood of success of the insurer in defending against the [underlying claim]" has been adversely affected, id. at 330.  Applying this two part test, the district court found the LMI had suffered no prejudice because material evidence had not been irretrievably lost, and no meritorious defense existed to Chemical Leaman's underlying liability under CERCLA.  Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F. Supp. 1136, 1158-59 (D.N.J. 1993).

The LMI contend the district court erred in holding Chemical Leaman's contractual obligation to notify it of claims arose, at the earliest, in 1984.  They argue that obligation arose as much as twenty years earlier, when Chemical Leaman received complaints of environmental pollution from various regulatory bodies.  We disagree.  Chemical Leaman could not have known of the liabilities for which it seeks coverage until the EPA placed the Bridgeport site on the Superfund National Priorities List in 1984.  Prior New Jersey state actions against Chemical Leaman had sought only non-monetary injunctive relief. Because 1984 was the earliest practicable date by which Chemical Leaman could have given notice to the LMI, the LMI's assertions that potential valuable evidence was lost prior to 1984 are irrelevant.  While the LMI also argue that evidence was lost, and witnesses died, between 1984 and 1988, they have not disputed that "a wealth of relevant documentary evidence remains intact." Id. at 1159.  Moreover, the LMI had extensive opportunities to depose, and later cross-examine, Harry Elston, the designer of the Bridgeport site.  Accordingly, the district court correctly found that the LMI had not irretrievably lost any substantial right due to Chemical Leaman's untimely notice.

In addition, the LMI assert that Chemical Leaman's failure to give timely notice adversely affected their ability to defend against the underlying claim.  But the district court held no prejudice had resulted:

> Chemical Leaman, as owner and operator of the Bridgeport facility, is strictly liable under CERCLA for damages for injury to, destruction of, or loss of natural resources, as well as for the reasonable costs of assessing such damage to natural resources, and all costs of removal, remediation, or other necessary response costs. Chemical Leaman's liability for these damages is retroactive, joint, and several, and imposed regardless of fault. Defendants do not contend that a meritorious challenge exists to the findings, made in the 1985 consent order . . . . Nor do defendants assert there is a meritorious defense to the EPA's allegation that the presence of hazardous substances at the Bridgeport facility and their migration to surrounding soils and groundwater constitute a release within the meaning of section 101(22) of CERCLA, 42 U.S.C. 9601(222). Accordingly, the court finds that defendants have not shown a likelihood of success in defending Chemical Leaman against claims under CERCLA.
>
> Defendants also ask this court to find that timely notice would have resulted in a likelihood that the insurance carriers would have reached a more favorable settlement. However, defendants fail to demonstrate what better arrangement the insurance carriers would have been able to obtain if they had assumed Chemical Leaman's defense upon timely notice.

Id. On appeal, the LMI have not advanced any arguments that cause us to doubt the district court's conclusion.

Finally, the LMI question whether the New Jersey Supreme Court would apply the two part Morales test in determining whether an insurer has suffered appreciable prejudice. But the LMI have not directed us to any New Jersey precedent that questions the vitality of Morales. Accordingly, their contention lacks merit.

### VIII. Discovery Misconduct

The LMI assert that Chemical Leaman willfully suppressed the identity of relevant witnesses and failed to produce certain documents. After trial, the LMI moved for relief from the judgment and a new trial under Federal Rule of Civil Procedure 60(b)(3). The district court denied the motion, although it believed a "close question" had been presented. After reviewing the record and the arguments of the parties, we conclude the district court did not abuse its discretion in denying the LMI's motion.

### IX. Conclusion

For the foregoing reasons, we will affirm the district court except as to the allocation of liability among applicable

policies.  We will remand to the district court for a reallocation of damages among applicable policies in accordance with the New Jersey Supreme Court's holding in Owens-Illinois, 650 A.2d at 993-95.

Chemical Leaman Tank Lines v. Aetna Casualty, et al.
Nos. 93-5777/5794

McKEE, Circuit Judge, concurring in part, and dissenting in part.

I must respectfully dissent from part III of the majority opinion because I do not agree with the majority's interpretation of Morton International, Inc. v. General Accident Ins. Co. of America 629 A.2d 831 (N.J. 1993), cert denied, 114 S. Ct. 2764 (1994).  I believe Morton mandates an objective inquiry in disputes such as this.  Because the district court's jury instruction improperly focused on Chemical Leaman's subjective intent, I would remand this matter to the district court for retrial to determine if "exceptional circumstances" objectively established Chemical Leaman's intent to cause injury, and if so, whether the extent of the resulting injury was foreseeable.

I.  The Evolution of The "Intent" Analysis in "Occurrence-Based" Policies

Although the majority's analysis has much to commend it, I believe that a more thorough discussion of the evolution of New Jersey's law in this area is necessary to fully understand Morton.  An appreciation of the development of that law casts a different light upon the portions of Morton that control our analysis.

A. Atlantic Employers Ins. Co. v. Tots & Toddlers Pre- School Day Care Center, Inc.

Our analysis must begin with, and be guided by a discussion of Atlantic Employers, because it used language that the court would later cite and which I believe has caused my colleagues to take an incorrect analytical turn.  In Atlantic Employers, parents of children who had been sexually abused sued the owners and operators of a day care center where the abuse purportedly took place.  The company that insured the center then brought a declaratory judgment action to determine its obligation to defend or indemnify the owners for any recovery the plaintiffs might win in their personal injury suits based upon negligence and intentional tort.

The day care center's insurance policy insured against damage resulting from an "occurrence."  An "occurrence" included injury or damage that was "neither expected nor intended by the insured."  Atlantic Employers, 571 A.2d at 303.  The policy also contained an exclusion for violations of penal statutes or

ordinances.  The Appellate Division first noted the general rule that "coverage does exist . . . 'for the unintended results of an intentional act, but not for damages assessed because of an injury intended to be inflicted.'"  Id. (citation omitted).  The court stated:

> There seems to be no dispute that if . . . Robert Knighton sexually molested the children, then he had the requisite level of intent to be found guilty of sexual molestation, based on the criminal statutes of this State.  But appellants insist that this does not necessarily mean that he intended the damages or injuries incurred by the children as a result of such actions. . . .  Further, they insist that the existence of such intent cannot automatically be imputed to the other insureds under the policy so as to exclude coverage. . . .  We reject this position.

Id.  The court then examined cases from other jurisdictions in order to analyze the insureds' argument in context with developing law.  The court noted that some jurisdictions employed a subjective test in determining insurance coverage under these circumstances, and some relied upon an objective test.  The court concluded that public policy mandated an objective approach.

> As a matter of public policy and logic we conclude that the better rule warrants application of the objective approach. A subjective test suggests that it is possible to molest a child and not cause some kind of injury, an unacceptable conclusion. . . .
> . . . It is simply against public policy to indemnify a person for a loss incurred as a result of his[/her] own willful wrongdoing.

Id. at 304.  Thus, the court held that policy, as well as logic, required an "objective approach" as an exception to the general rule.

B. Prudential Property & Casualty Ins. Co. v. Karlinski

Within a year and a half of Atlantic Employers, the Appellate Division decided Karlinski.  There, insured's 13-year old son (James) had engaged in a prearranged fight with a 14-year old (Mark) in which Mark had fallen and suffered a broken hip.  The court was asked to determine if a homeowner's policy obligated the plaintiff insurer to defend and indemnify the defendant.  The policy excluded coverage for "'bodily injury . . . which is expected or intended by the insured.'"  Karlinski, 598 A.2d at 919.  The motion court granted the insurer's motion for summary judgment noting that the son of the insured "'instigated the fight and threw the first blow and started the fight.  As far

as I am concerned, it is intentional conduct and the coverage doesn't apply.'" Id. The motion judge also concluded that "a broken 'leg' [Mark actually suffered a broken hip] was not an extraordinary consequence of the fight." Id.

On appeal the court aptly noted, "[t]he appeal requires that we again explore the frequently visited but still unclearly charted area of liability coverage for intentional torts which produce unintended results." Id. The court went on to observe:

> Our review of New Jersey authorities satisfies us that . . . it is difficult to ascertain a clear weight of authority on the subject of liability insurance coverage for unintended results of intentional acts. Differing combinations of variables, such as the language of the exclusion clause, the nature of the harm and its relationship to the intentional act, and the availability of relief to the injured party, appear to influence the extent to which our decisions have inquired into the nature of the intent.

Id. at 921. The court then stated:

> [W]e hold that, when a coverage exclusion is expressed in terms of bodily injury expected or intended by the insured, and where the intentional act does not have an inherent probability of causing the degree of injury actually inflicted, a factual inquiry into the actual intent of the actor to cause that injury is necessary.

Id.

### C. Voorhees v. Preferred Mutual Ins. Co.

In Voorhees, a parent was sued for statements she had made at a public meeting where she had questioned the competency of her child's teacher. The teacher claimed she had suffered emotional distress and mental anguish as a result of the parent's conduct. The teacher alleged that the parent had acted "willfully, deliberately, recklessly and negligently," in making false accusations that had damaged the teacher professionally, and subjected her to public ridicule. Voorhees, 607 A.2d at 1257. Medical evidence established that the emotional distress the teacher complained of had resulted in "'an undue amount of physical complaints,' including 'headaches, stomach pains, nausea, . . . [and] body pains.'" Id. at 1258.

The parent had a homeowner's policy that provided coverage for liability arising from "bodily injury" caused by an "occurrence." The policy defined an "occurrence" as an

"accident," and excluded coverage for bodily injury intentionally caused by the insured.  The insurer relied upon this language and refused to defend the insured against the teacher's suit, asserting that the claims were based on the insured's intentional act and that the complaint sought damages for a "personal" rather than a "bodily" injury.  The parent eventually sued her carrier for damages resulting from its refusal to provide a defense and indemnify her.  Both parties moved for summary judgment.

The trial court granted the insurer's motion ruling that the complaint did not allege the kind of "bodily injury" that would be covered under the policy.  A divided panel of the Appellate Division reversed.

The New Jersey Supreme Court noted that the duty to defend under the policy was not triggered "absent a potentially-coverable occurrence."  Id. at 1262.  In assessing whether the insured's statements constituted a potentially coverable occurrence, the court first held that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury."  Id. at 1264.  As to what constitutes an "intent to injure," the court noted that the general trend in the law appeared to require an inquiry into the actor's subjective intent to cause injury:

> We adhere to the prevalent New Jersey rule and hold that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury.  If not, then the resulting injury is "accidental," even if the act that caused the injury was intentional.  That interpretation prevents those who intentionally cause harm from unjustly benefitting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing.  It also accords with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm.
>
> Even if the operative question is the intent to injure rather than to act, the question of what constitutes an "intent to injure" remains.  The key issue is whether the court must find a subjective intent to injure, or whether it can presume an intent to injure from the objective circumstances.  In that regard, our inquiry parallels that taken in interpreting policy exclusions for intentional acts.

> Those exclusions preclude coverage
> for injuries expected or intended
> by the insured.  Case law
> interpreting those policy
> exclusions, in addition to that
> interpreting the definition of
> "occurrence," is thus relevant.
>     The general trend appears to
> require an inquiry into the actor's
> subjective intent to cause injury.
> Even when the actions in question
> seem foolhardy and reckless, the
> courts have mandated an inquiry
> into the actor's subjective intent
> to cause injury.

Id. at 1264.

The court, however, recognized that:

> When the actions are
> particularly reprehensible, the
> intent to injure can be presumed
> from the act without an inquiry
> into the actor's subjective intent
> to injure.  That objective approach
> focuses on the likelihood that an
> injury will result from an actor's
> behavior rather than on the
> wrongdoer's subjective state of
> mind.

Id. at 1265.  The Voorhees court reasoned that the insured's actions there were a far cry from the type of egregious behavior that had justified an objective approach in Atlantic Employers. The court held that "[a]bsent exceptional circumstances that objectively establish the insured's intent to injure," the insured's subjective intent to injure must govern.  Id.  The Voorhees court's reference to "exceptional circumstances" was clearly intended to recognize the need for an objective test in the specific circumstances it confronted in Atlantic Employers, and it foreshadowed the test it would proclaim in Morton.

Although the court in Voorhees felt that there was little evidence of a subjective intent to injure the teacher, the court never had to address this question because the plaintiff had also alleged that the insured had acted negligently.  The allegation of negligence presupposed the absence of a subjective intent to injure and stated a claim for a potentially coverable occurrence thus triggering the insurer's duty to defend.  See Id. Accordingly, the court affirmed plaintiff's award of summary judgment.

D. SL Industries, Inc. v. American Motorists Ins. Co.

In SL Industries, an employee had filed suit against his employer alleging age discrimination and common law fraud as a result of the employer eliminating his position.  The employee sought recovery for the alleged bodily injury that resulted.  The employer was insured under a policy in which the insurer agreed

to defend and indemnify the employer for all sums resulting from a bodily injury caused by an "occurrence." "Occurrence" was defined as an "'accident . . . which results in bodily injury . . . neither expected nor intended from the standpoint of the insured.'" SL Industries, 607 A.2d at 1269-70.

The employer settled the suit and then brought a declaratory judgment action against its insurer to establish its right to indemnification. The Law Division granted the insurer summary judgment, but the Appellate Division reversed, holding that although intended harm was not covered under the policy, the policy did provide coverage for the unforeseen results of intentional conduct. The court then remanded the case to the Law Division to determine whether the employee's emotional distress had been intended or whether it was foreseeable.

On appeal, the New Jersey Supreme Court had to determine if the general intent to injure that is inherent in a claim of fraud necessarily incorporates the intent to cause the specific injury (emotional distress), or whether proof of a subjective intent to cause the specific injury is required. Id.at 1277-1279. The court began its analysis of the required intent by examining the differing approaches taken by earlier cases.

> Our courts have taken different approaches to the question of how specifically the insured must have intended the resulting injury. Employing the "Lyons" test, some courts have held that a subjective intent to injure ends the inquiry and precludes coverage. Under that approach, if there is a subjective intent to injure then any injury that results from the action will be deemed "intentional," even if the injury is different from or greater than that intended. . . .
>
> On the other hand, some courts have indicated that to preclude coverage if the injury that actually occurred was not a probable outcome of the wrongful act is unfair [discussing Karlinski]. . . . However, in those circumstances in which the facts indicate that the acts in which the insured engaged were unlikely to result in the degree or type of injury that in fact occurred, an inquiry into the subjective intent to cause the resulting injury is in order.
>
> A third approach is even more likely to lead to coverage. In

Hanover Insurance Group v. Cameron, the court rejected the insurance company's argument that to preclude coverage only the intent to harm need be demonstrated. The court indicated that "intent" would only be found when the actual consequences that resulted from the act were intended, or when the actor was substantially certain they would result.

To determine which approach to adopt, we refer to the general principles underlying the interpretation of insurance-policy provisions involving intentional conduct.

The Lyons test . . . precludes coverage in some cases in which an insured could reasonably expect coverage. When the injury caused significantly exceeds the injury intended or expected and is an improbable consequence of the wrongful act that caused it, then it is hard to characterize the injury as truly 'intentional.' The injury, from the standpoint of the insured, is 'accidental,' and could thus be deemed an occurrence. Moreover, if the tortfeasor did not intend or expect to cause the resulting harm, denying coverage will not deter the harmful conduct. In that case, there is no policy justification for denying the victim the possibility of additional compensation. As the Karlinski court noted, precluding coverage 'even if the actual harm far exceed[s] the consequences which might reasonably be expected by the insured . . . diminishes the injured party's realistic possibility of recovery more than it impacts upon the insured tortfeasor.'

On the other hand, an approach allowing coverage whenever the adverse consequences intended by the tortfeasor did not precisely match the actual consequences of their wrongful actions undermines the basic policy against

> indemnifying wrongdoers.
>
> We believe the Karlinski test
> presents the most reasonable
> approach. . . . Assuming the
> wrongdoer subjectively intends or
> expects to cause some sort of
> injury, that intent will generally
> preclude coverage. If there is
> evidence that the extent of the
> injuries was improbable, however,
> then the court must inquire as to
> whether the insured subjectively
> intended or expected to cause that
> injury. Lacking that intent, the
> injury was 'accidental' and
> coverage will be provided.

Id. at 1277-78 (citations omitted).

Accordingly, the court affirmed the Appellate Division's judgment remanding the case to the Law Division to determine whether the employee's emotional distress had been a probable outcome of the insured's general intent to injure, and if not, whether the insured had the subjective intent to injure the employee. See Id. at 1279.

E. Morton International, Inc. v. General Accident Ins. Co.

Finally, in Morton, the New Jersey Supreme Court had to apply the law of "occurrence-based" insurance policies to the very different realm of injuries to the environment. There, the insured, Morton International, sued primary and excess CGL insurers seeking reimbursement for costs incurred in defending a suit filed by the Department of Environmental Protection (DEP), as well as indemnity for cleanup and remediation expenses resulting from the DEP proceeding. Morton, 629 A.2d at 834-835. Morton's predecessors, including Ventron Corporation, had polluted a body of water known as Berry's Creek to such an extent that "[f]or a stretch of several thousand feet, the concentration of mercury in Berry's Creek [was] the highest found in fresh water sediments in the world." Id. at 834. Morton's claims were derived from Ventron as well as other prior owners of the land. See Id.. The DEP sued Ventron and other prior owners to compel them to pay for remediating the pollution of Berry's Creek and the surrounding area. The environmental damage had been caused by discharges from a mercury-processing plant operated for forty years by the various defendants. See New Jersey Department of Environmental Protection v. Ventron Corp., 468 A.2d 150 (N.J. 1983).

In the underlying suit to establish liability, the New Jersey Supreme Court affirmed the Appellate Division's judgment holding the defendants jointly and severally liable. The court reasoned that the discharge of mercury constituted an abnormally dangerous activity, and imposed strict liability against all defendants. See Id. at 160.

Morton then commenced a declaratory judgment action to

determine its right to indemnification from the various insurers that had provided primary and excess coverage while the mercury-processing plant was in operation. The primary issue that the court had to determine was whether the pollution resulted from an "occurrence" under the applicable policies. To qualify as an "occurrence" the environmental damage must not have been "expected nor intended from the standpoint of the insured." Morton, 629 A.2d at 836. The trial court granted the insurer's motion for summary judgment. The Appellate Division reversed holding that the trial court had "focused improperly on the manner in which the injury had been caused and had erroneously concluded that the policy did not provide coverage for the unexpected result of a deliberate act." Id. at 877 (citation omitted).

The Appellate Division also relied upon Atlantic Employers to conclude that "'[t]he intentional character of the act is the basis for the inference that the insured either intended or was manifestly indifferent to the prospect of injury.'" Id. (citation omitted). In reaching this conclusion, the Appellate Division (without the benefit of either Voorhees or SL Industries) noted that the "'substantial environmental pollution over a long period'" together with the knowledge by Morton's predecessors that "'the substance being discharged . . . was toxic and harmful'" rendered unacceptable a conclusion that no harm had been expected." Id. (citation omitted).

On appeal to the New Jersey Supreme Court, Morton argued that the Appellate Division's reliance on Atlantic Employers improperly equated the discharge of pollutants with child molestation as acts that could be deemed intentionally injurious as a matter of law. Morton further argued that "the Appellate Division improperly invoked an objective standard for determining whether harm had been intended or expected under the `occurrence'-based policies, ignoring the long-standing principle that coverage exists for the unintended results of intentional acts." Id.

The court began its analysis by acknowledging the unique circumstances that surround issues of insurance coverage for environmental damage.

> In applying our holding in Voorhees to claims seeking coverage for property-damage caused by environmental pollution under occurrence-based CGL policies, we acknowledge the impracticality of adherence to the general rule that "we will look to the insured's subjective intent to determine intent to injure." Although insureds may concede that pollutants -- even known pollutants -- had been intentionally discharged, those insureds are virtually certain to insist that the resultant harm was unintended

and unexpected. Absent "smoking gun" testimony from a disgruntled employee, proof of subjective intent to cause environmental harm will rarely be available in [environmental insurance] coverage litigation.

We noted in Voorhees that an alternative to proof of subjective intent to injure existed in those cases in which the insured's "actions are particularly reprehensible, [so that] the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure." We cited Atlantic Employers . . . as illustrative of conduct that was so inherently injurious as to warrant the conclusion that intent to injure could be presumed. . . . We are unpersuaded that environmental-pollution litigation should generally be included in that category of cases, typified by Atlantic Employers, in which reprehensible conduct justifies a presumption that injury was intended.

Id. at 879 (citations omitted) (emphasis added).

Instead of relying upon such an unwarranted presumption and thereby extending the "public policy and logic" of Atlantic Employers, the court called for an individualized inquiry based upon the facts of each case.

[I]nsureds held responsible for remediation of environmental pollution vary significantly in their degree of culpability for the harm caused by pollutant discharges. A general rule in environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified.

Instead, we hold that in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, "exceptional circumstances [exist] that

objectively establish the insured's
intent to injure."

Id. at 879-80 (citation omitted) (emphasis added).  The term
"exceptional circumstances" had been used in Voorhees.  As noted
above, there, the court stated that, absent exceptional
circumstances, the subjective intent of the insured controlled
whether there was an "occurrence" under an occurrence-based
insurance policy.  In Voorhees, the court had stated that it was
adopting the majority view that requires proof of a
transgressor's subjective intent.  Voorhees at 607 A.2d at 1255.
        The court, however, had also noted that "[w]hen the
actions are particularly reprehensible, the intent to injure can
be presumed from the act without an inquiry into the actor's
subjective intent to injure." Id. at 1265.  In the context of
Atlantic Employers, the reprehensible actions of child
molestation did indeed "'[a]s a matter of public policy and logic
. . . warrant[] application of the objective approach.'" Id.
Then, the court used the language that separates me from my
colleagues.  The court added: "[a]bsent exceptional circumstancesthat
objectively establish the insured's intent to injure, we
will look to the insured's subjective intent to determine intent
to injure." Id. (emphasis added).
        III.  Morton Applied to the Instant Dispute
        In Morton, the court was careful to distinguish the
policy considerations in pollution coverage cases from those that
dictated an objective approach in all cases of child molestation.
"We are unpersuaded that environmental-pollution litigation
should generally be included in that category of cases, typified
by Atlantic Employers, in which reprehensible conduct justifies a
presumption that injury was intended." Morton, 629 A.2d at 879.
This does not mean, as the majority suggests, that the alleged
polluter's subjective intent controlled. It only means that the
act of polluting is not so reprehensible that "public policy and
logic" require a presumption that the resulting harm is intended
as a matter of law. Rather, the circumstances surrounding the act
of polluting must be examined in each case to determine if, in
that particular situation, they objectively establish an intent
to harm the environment, thereby negating an occurrence.
        The court then listed those circumstances that would
objectively establish this intent.

                Those circumstances include the
                duration of the discharges, whether
                the discharges occurred
                intentionally, negligently, or
                innocently, the quality of the
                insured's knowledge concerning the
                harmful propensities of the
                pollutants, whether regulatory
                authorities attempted to discourage
                or prevent the insured's conduct,
                and the existence of subjective
                knowledge concerning the

possibility or likelihood of harm.

Id. at 880.  Accordingly, I cannot agree when my colleagues state, "[w]e believe the New Jersey Supreme Court designed the 'exceptional circumstances' exception to apply only to egregious conduct." Majority Op. at 27.  One can only determine if conduct is egregious by examining the "exceptional circumstances" in which it occurred.  Indeed, an examination of those circumstances may well establish that a particular polluter's conduct was not egregious at all.

The majority's error is reflected in what the court in Morton did.  It did not require proof of the subjective intent to pollute on the part of the insured or its predecessors.  Rather, it examined the record and determined that the circumstances before it objectively established an intent to harm. "In determining whether in the context of this record the trial court properly concluded, as a matter of law, that Morton's predecessors had intended or expected environmental injury, we focus on those factors [i.e. the "exceptional circumstances"] that we previously have identified to be significant." Morton, 629 A.2d at 882. The court then noted the duration of the discharge, the intentional nature of the discharge, the insured's knowledge of the likely environmental harm, and the history of "stonewalling."  In conclusion, the court noted that its examination of these circumstances confirmed that "damage qualitatively comparable to that found to exist . . . must have been anticipated by Morton's predecessors on the basis of . . . prolonged knowledge of and avoidance of compliance with complaints by regulatory officials." Id. at 884.

This is consistent with the court's pronouncement that the mere fact of polluting, even to the egregious extent present in Morton, was not by itself, such reprehensible conduct that it required a conclusive presumption of an intent to harm. Moreover, the "exceptional circumstances" include "the existence of subjective knowledge concerning the possibility or likelihood of harm."  However, subjective knowledge is not used to definitively determine if the insured expected or intended environmental damage.  Rather, the insured's subjective knowledge is but one of those "exceptional circumstances" that determine if an "occurrence" has taken place. It is not the start and finish of that inquiry as the majority's reasoning suggests.

The Morton court concluded that exceptional circumstances established as a matter of law that there had been no occurrence as Morton's predecessors had to have expected the pollution they caused.  The objective nature of this conclusion is evident because the court clearly stated that is was not deciding whether Morton's predecessors "intended" (i.e. "subjectively") the damage:

> Without determining that such
> damage was intended, we find
> inescapable the conclusion that
> damage qualitatively comparable to
> that found to exist in the Ventron
> litigation must have been

anticipated by Morton's predecessors on the basis of their prolonged knowledge of and avoidance of compliance with complaints by regulatory officials that the company was discharging unacceptable emissions, including mercury compounds, into Berry's Creek. Based on that conclusion,. . . as a matter of law the property damage to Berry's Creek and the surrounding area was not caused by an "occurrence" within the meaning of the term in the various CGL policies.

Id. at 884 (emphasis added).

In adopting prior law (particularly the holding in Karlinski) to environmental insurance coverage, the court in Morton noted that subjective evidence of the polluter's intent did not become relevant merely because the extent of pollution was greater than anticipated.

Turning to the question whether environmental injury was intended or expected, we first observe that although the magnitude of the damage to Berry's Creek and the surrounding areas may exceed any intention or expectation attributable to Morton's predecessors, we do not consider that differences in harm relating to the severity of environmental damage give rise to a finding of "improbability" of harm that invokes the need for evidence of subjective intent. Whether Morton's predecessors anticipated that discharges of untreated effluent on the plant site and into Berry's Creek for more than forty years would cause environmental harm of the severity described . . . hardly demonstrates that the extent of the injury was "improbable." The holding in SL Industries was based on the Appellate Division's ruling in Karlinski, that in a coverage action arising from a fight between two young teenagers in which one sustained a broken hip, a factual issue of subjective intent was presented because of the inherent

> improbability that the skirmish would result in a hip fracture. No such inherent "improbability" can be ascribed to the environmental damage attributable to Morton's predecessors.

Id. at 882 (citations omitted).

The majority notes that the district court held that

> Chemical Leaman's actions were not so reprehensible as to justify the presumption of an intent to cause property damage under the "exceptional circumstances" exception. It concluded that Chemical Leaman was not "throwing toxic waste out into the meadow- lands" as Morton and its predecessors had done; rather, it had "designed and built the facility to prevent [harm to the environment]."

Majority Op. at 20. (emphasis added). The "exceptional circumstances" test, however, is not an "exception," but the rule that is to be applied in environmental coverage cases. In addition, although Chemical Leaman was not reducing Berry Creek to one of the world's great environmental disasters as was the case in Morton, there is nevertheless testimony from which a reasonable jury could conclude that "exceptional circumstances" objectively establish Chemical Leaman's intent to harm the environment.

The majority holds that after Morton, a court can determine that an insured is entitled to indemnification under an occurrence-based policy as a matter of law absent "exceptional circumstances." My colleagues suggest that "exceptional circumstances" merely

> define when no reasonable jury could find the insured did not intend or expect to cause property damage because objective circumstances––evidence of prolonged, intentional, or flagrant discharges of known pollutants in the face of regulatory disapproval––establish that the insured must have intended property damage. The presence of "exceptional circumstances" requires a court to enter judgment as a matter of law. Their absence, of course, does not prevent a jury from finding an insured "expected" or "intended" to cause property damage.

See Majority Op. at n.7. However, Morton did not quantify the factors it identified as objectively establishing intent to pollute. Rather, the "case-by-case analysis" was necessary for the fact finder to make an individualized determination of whether the nature of those factors in a particular case justified denying coverage in lieu of the limitations contained in the insurance contract. Thus, I agree that the absence of the

factors detailed at footnote 7 of the majority opinion "doe[] not prevent a jury from finding an insured 'expected' or 'intended' to cause property damage," but not for the reason stated by the majority. Rather, it is because "subjective knowledge concerning the possibility or likelihood of harm" is one of the "exceptional circumstances" that a jury must also consider. Accordingly, if an insured knows that its actions will most likely harm the environment, just one, brief, discharge of a known pollutant by one who had otherwise complied with regulatory authorities could preclude coverage under an occurrence-based insurance policy.

The majority argues that Morton cannot be read as creating an objective test for intent because an insured who "intentional[ly] discharges a known pollutant generally intends 'some sort of harm,' however de minimis, and the harm that actually results is usually a probable result of the discharge." Thus, (the majority suggests) an objective test "would result in a general rule precluding [all] coverage based on the knowing discharge of a pollutant." Majority Op. at 23. That is, however, precisely why it is necessary to use "exceptional circumstances" to prove intent to harm objectively in pollution cases. If the resulting inquiry establishes that the insured did objectively "intend" to harm the environment, the inquiry into the foreseeability of the actual damage makes perfect sense.

The majority expresses a further concern that reading Morton to require anything other than subjective intent "would be akin to a negligence standard [,and] [i]f negligent acts did not fall within the definition of a covered occurrence, then there would be no point in purchasing comprehensive general liability insurance." Majority Op. at 18 (citing Pittston Co. v. Allianz Ins. Co., 905 F. Supp. 1279, 1301 (D.N.J. 1995)). A properly guided inquiry into "exceptional circumstances," however, does not equate with a negligence standard. It assigns the cost of environmental remediation not based upon negligence, but upon the "degree of culpability for the harm caused by pollutant discharges." Morton, 629 A.2d at 879.

IV. The Exceptional Circumstances of The Bridgeport Site.

Throughout the time the pond and lagoon system was in use there were repeated discharges of waste through the overflow pipe to the adjacent swamp. In fact, the very purpose of the overflow pipe was to allow for these discharges. An Inspector observed the discharge from the last pond during a September 12, 1961 visit and thereafter observed similar discharges on about half of his visits to the Bridgeport site. In November 1968, water pollution inspectors from the New Jersey Department of Health again observed the discharge from the overflow pipe in the last lagoon. Although it was characterized as a sporadic "trickle", an engineer employed by Chemical Leaman (Elston), and at least one other employee admitted that the overflow pipe did discharge into the swamp throughout the time the pond and lagoon system was in use. Moreover, there was evidence that by 1974, the path of this "trickle" from the last impoundment could "be easily seen by looking for a 75-foot wide lane of dead trees" in the swamp.

The Morton court concluded that the discharge of

pollutants there was intentional once the polluters knew it was unacceptable. Morton, 629 A.2d at 882. There, the repeated demands of the Department of Health that the owner halt the discharges or install adequate treatment facilities were regularly ignored. Id. Here, the intentional nature of the discharge is also evident. Chemical Leaman intentionally designed its waste treatment system so that the overflow pipe would discharge into the swamp. Furthermore, even under the subjective framework that the jury was given to review the evidence, it concluded that Chemical Leaman's releases were intentional. That conclusion is supported by the record and Chemical Leaman cannot now successfully argue that the discharges were anything but intentional. Indeed, Chemical Leaman's denials illustrate the concern expressed in Morton that a polluter may admit to the discharge, but would never admit to intentionally polluting the environment. That concern could only be satisfactorily addressed by the objective test that the majority today rejects.

Here, as in Morton, the intentional nature of the discharge is confirmed by Chemical Leaman's continued evasion of the State's demands to stop the discharge. The unacceptable condition of the discharge from the overflow pipe into the swamp was brought to Chemical Leaman's attention by a governmental inspector in September of 1961. Although Chemical Leaman installed three more lagoons in an attempt to alleviate this situation, the overflow pipe remained a staple of the Bridgeport site and in 1968, Chemical Leaman was still discharging wastes into the lagoon.

State officials regularly informed Chemical Leaman that the effluent flowing from the overflow pipe constituted an unacceptable discharge into the swamp. In 1961, FGW told Chemical Leaman that the discharge was an unacceptable condition and that the resulting pollution should be stopped within a year. Subsequently, in 1968, the NJDOH told Chemical Leaman that "the waste emanating from the lagoon is highly pollutional and [that] immediate measures [should] be taken to eliminate this discharge or to sufficiently treat the waste prior to discharge" and in 1969, Chemical Leaman was ordered to find an alternative method of waste treatment.

Chemical Leaman argues that it was not aware of the harmful propensities of its pollutants because it was not discharging pure chemicals, but rather "trace amounts" of these chemicals in highly diluted rinsewater. The uncontroverted evidence, however, clearly showed that at least by 1968, Chemical Leaman was alerted that the discharge into the swamp was "highly pollutional" even in its diluted form. Furthermore, as noted above, however diluted the discharge may have been, it was sufficiently potent to sculpt the 75-foot wide path of dead trees into the environmental landscape it touched.

It is certainly true that Chemical Leaman is more sympathetic than the polluters in Morton, who engaged in a deliberate pattern of "stonewalling" characterized by promises of compliance that went unfulfilled. Morton, 629 A.2d at 882. As the majority notes, Chemical Leaman apparently thought that its

natural filtration system would reduce the danger of pollution. In fact, it was designed to do just that. Nevertheless, the record here could clearly support a finding that Chemical Leaman was "stonewalling" regulatory authorities. There is a pattern of unfulfilled promises of compliance to state agency requests to abate the polluting discharge.

Even after officials caught Chemical Leaman discharging into the swamp in 1968 and ordered it to find a better way to treat wastes in 1969, Chemical Leaman did not improve the waste treatment system until the summer of 1975, when it entered into a disposal contract with Du Pont. In the interim, 40 to 50 million gallons of contaminated waste water had been processed using the same treatment system.

Thus, from 1961, when the State first notified Chemical Leaman that the discharge to the swamp was unacceptable, until 1975, when Chemical Leaman began off-site disposal at the Du Pont plant, Chemical Leaman responded to regulatory agencies with promises of compliance that went unfulfilled. Chemical Leaman was informed that the discharge to the swamp was unacceptable. Although the state did not articulate why the discharge was improper, it is difficult to imagine what other reason Chemical Leaman could have attributed to the state's concern if not the impact of the discharge upon the environment. It is clear from Chemical Leaman's own argument in this regard that it never attempted to ascertain the reason for the State's concern.

Nevertheless, assuming arguendo that in 1961 Chemical Leaman could not ascertain that its system was damaging the environment, there is no dispute that Chemical Leaman learned that the discharges to the swamp were likely to cause harm as of November of 1968, when it was expressly told that "the waste emanating from the lagoon is highly pollutional and [that] immediate measures [should] be taken to eliminate this discharge or to sufficiently treat the waste prior to discharge." Even more telling is Harry Elston's concession at trial that both at the time of FGW's inspections in 1961 and 1962, and at the point when NJDOH issued its order in 1969, he knew that Chemical Leaman's discharge into the swamp was causing some damage to the swamp. Finally, it should be noted that Chemical Leaman never obtained the required permits for its waste disposal cite. Thus, it took regulatory authorities even longer to discover the "highly pollutional" discharge. Once the cite was discovered, Chemical Leaman's compliance with regulatory agencies was less than exemplary.

Chemical Leaman discharged approximately 100 million gallons of contaminated waste water into its unlined ponds and lagoons for the fifteen years that the Bridgeport site was in operation. The bottom of those lagoons was only two and a half feet above the groundwater, and the insurers' expert testified that the soil, groundwater, and swamp contamination was the probable result of this discharge. That testimony was not refuted by Chemical Leaman's expert even though Chemical Leaman argues on appeal that their unlined treatment system was the state of the art.

I cannot say that such a course of conduct does not

negate the existence of an occurrence under New Jersey law.

## V. Conclusion

Courts that have addressed the issue of the kind of intent that would negate insurance coverage under an occurrence-based policy have been guided by certain policy considerations. Courts have attempted to maximize the possibility that victims be compensated for their injuries while minimizing indemnification of the wrongdoer. See Voorhees, 607 A.2d. at 1264. They have also been concerned that the law in this area deterred wrongdoers. See SL Industries, 607 A.2d at 1278. Looking to "exceptional circumstances" to objectively determine intent to harm the environment does just that. To the extent that those circumstances suggest that the insured did not intend environmental harm, and cooperated with regulatory authorities to avoid it, the insured will likely be indemnified for the cost of remediation under an occurrence policy even where it discharged a known pollutant. To the extent that those circumstances establish a protracted and/or deliberate discharge, however, a disregard for the environment, knowledge of the properties of a pollutant, "stonewalling" regulatory agencies and the insured's subjective knowledge of the possibility of harm; "public policy and logic" require that the insured, and not its insurers, pay the cost of environmental cleanup. That allocation of cost deters persons from closing their eyes to the environmental impact of their activities.

Furthermore, this is consistent with the long-standing doctrine of enforcing insurance contracts in a manner that is consistent with the reasonable expectations of the parties. An insured cannot reasonably expect to escape the "occurrence-based" limits on its right to indemnification where "exceptional circumstances" establish its culpability for pollution. Similarly, an insurer should be able reasonably to expect that it will not be required to reimburse such a polluter for the environmental damage so callously caused.

This is the result the New Jersey Supreme Court sought to promote in Morton. Yet, the rule we adopt today will give polluters comfort and allow them to discharge pollutants in relative safety because of the obvious impracticality of establishing their subjective intent to harm the environment. Since the New Jersey Supreme Court recognized the impracticality of a subjective approach in environmental coverage disputes, I find it difficult to believe that it intended this result. The majority concludes that the New Jersey Supreme Court established a subjective standard in environmental insurance disputes while proclaiming such a rule to be so impractical as to be unworkable. As a result, our holding places insurers in the impossible situation the New Jersey Supreme Court sought to avoid by its thoughtful pronouncement of an objective "exceptional circumstances" test in disputes over liability for cleaning up pollution.