

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-8-2001

# Transportes Ferreos v. NKK Corp

Precedential or Non-Precedential:

Docket 99-5697

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Transportes Ferreos v. NKK Corp" (2001). *2001 Decisions.* Paper 24.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/24

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 8, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5697

TRANSPORTES FERREOS DE VENEZUELA II CA,

      Appellant

v.

NKK CORPORATION; EDC, INC.;
THE SHEFFER CORPORATION

THE SHEFFER CORPORATION,

      Third-Party Plaintiff

v.

JORGENSEN STEEL & ALUMINUM, a division of
EARLE M. JORGENSEN COMPANY; ARTCO, INC.,

      Third-Party Defendants

EDC, INC.,

      Third-Party Plaintiff

v.

HARTFORD FIRE INSURANCE COMPANY,

      Third-Party Defendant

Appeal from the United States District Court
for the District of New Jersey
D.C. No. 96-cv-04016
District Judge: Dickinson R. Debevoise

Argued: December 4, 2000

Before: McKEE, ROSENN, and CUDAHY,*
Circuit Judges.

(Filed: February 8, 2001)

      Robert G. Clyne (argued)
      Hill Rivkins & Hayden LLP
      1 Exchange Place, Suite 1000
      Jersey City, NJ 07302-3911
       Counsel for Appellant

      Michael J. Breslin, Jr., Esq. (ar gued)
      Breslin & McNerney
      14 Washington Place
      Hackensack, New Jersey 07601
       Counsel for Appellee

OPINION OF THE COURT

CUDAHY, Circuit Judge.

In April 1995, the ship boom on a vessel owned by Transportes Ferreos de Venezuela II CA (TFV) collapsed. TFV sued EDC, Inc., the boom's designer and supplier , and in August 1998, the parties settled. As part of the settlement, EDC agreed to the entry of a $1 million judgment against it, in favor of TFV. TFV agr eed not to execute this judgment, and in exchange, EDC assigned its rights under an insurance contract it held with Hartford Fire Insurance Company (Hartford) to TFV . TFV then attempted to recover the amount of EDC's $1 million settlement from Hartford. The district court found for Hartford, holding that Hartford was substantially prejudiced by the fact that it was not notified of the accident until three years after it happened. W e reverse and remand.

_____

* Honorable Richard D. Cudahy, Circuit Judge, U.S. Court of Appeals for the Seventh Circuit, sitting by designation.

I. BACKGROUND

A. Facts

TFV owned two vessels that it used to transport ir on ore: the M/V Rio Caroni (a bulk carrier) and the F/T Boca Grande (a floating terminal and transfer station). The Rio Caroni carried iron ore down the Orinoco River in Venezuela from various inland points and, on arrival at the mouth of the river, unloaded the ore onto the Boca Grande. The Boca Grande then placed the ore on ocean-going vessels.

In August 1992, TFV's predecessor, Deltamar S.A., entered into a contract with the NKK Corporation for the conversion of the Rio Caroni from bulk carrier to self-unloading shuttle vessel. As part of the conversion, NKK was required to build a materials handling system--consisting essentially of a series of conveyor belts and a boom--that would be placed on the Rio Caroni to facilitate the movement of iron ore onto the vessel and its discharge from the vessel. NKK subcontracted the design and furnishing of the materials handling system to EDC, Inc., which was to provide NKK with engineering expertise, drawings and parts. In turn, NKK would then assemble the provided parts to complete the conversion of the Rio Caroni. See Appx. 119.

One of the parts EDC contracted to supply was a boom cylinder, which formed part of the boom's hoisting mechanism. Because EDC was itself unable to build the boom cylinder, EDC subcontracted the manufacture of this part to the Sheffer Corporation. Exactly which party designed the boom cylinder is unclear from the record on appeal. The purchase order for the boom cylinder, which refers to a "Sheffer Hydraulic Boom Hoist Cylinder," indicates that Sheffer regularly of fered several standard boom cylinder models for sale to the public. See Appx. 142. However, the numerous specifications in the purchase order--for example, the purchase or der stated that "blind or piston end of the cylinder to have pivot mount . . . suitable for 350 mm pin"--indicate that EDC pr ovided at least some special parameters with which Shef fer's cylinder was required to comply. See id. As such, the boom cylinder

3

appears to be a modified Sheffer cylinder , custom–built to EDC's specifications.

On April 15, 1995, the Rio Caroni's new boom suddenly collapsed while the vessel was unloading ore onto the Boca Grande, damaging both vessels. An investigation by W alter Herbst, president of EDC, revealed that the boom's collapse was due to a sudden fracture of the steel r od–eye, a component of the boom cylinder that had been built for EDC by Sheffer. See Appx. 151. However, Herbst's report was not able to pinpoint the exact cause of the r od–eye's failure, giving ten possible reasons for it––including possible design and manufacturing defects. At the request of TFV, EDC arranged for metallurgical testing of the rod–eye by Professional Services Industries, Inc. (PSI) to determine the precise cause of the rod–eye's failur e. PSI determined that the rod–eye failed in a brittle manner, possibly due to its fabrication from an inferior grade of steel. See Appx. 161– 62. Following PSI's analysis of the rod–eye, EDC refused to pay a monthly storage fee for the rod–eye. Consequently, the rod–eye was discarded by PSI prior to the commencement of this suit, and it cannot now be recovered.

B. District Court Proceedings

On August 21, 1996, TFV filed suit in the United States District Court for the District of New Jersey against NKK, EDC and Sheffer, seeking an awar d of $3.6 million for the physical damage to its vessels, as well as compensation for economic losses attributed to the vessels' being out of operation. In its answer to TFV's complaint, EDC asserted a cross-claim against Sheffer, alleging that Sheffer should pay any judgment entered against EDC because it had improperly manufactured the rod–eye. The district court had subject matter jurisdiction over this cause pursuant to 28 U.S.C. S 1332.

Through discovery, TFV learned that EDC was insured under a policy with Hartford. This Compr ehensive General Liability and Business Liability Policy provided a $2 million aggregate limit for business liability claims. On March 6, 1998, TFV notified Hartford of the accident and pending litigation. (Thus, Hartford became awar e of the accident

4

approximately three years after the accident occurred and not until after this litigation was instituted.) On May 15, 1998, EDC brought suit in New Jersey state court, seeking from Hartford coverage and/or a defense of TFV's suit. Hartford denied both coverage and a defense; thereafter, for reasons not reflected in the recor d on appeal, the state court action was dismissed. Hartford was then brought into the instant action as a third-party defendant by way of EDC's third-party complaint. In its thir d-party answer to this complaint, dated July 8, 1998, Hartford denied that its policy covered EDC for the losses sustained on TFV's vessels and refused to defend EDC in the pr esent action. See Appx. 46-53.

On August 10, 1998, approximately one month after being joined in the present lawsuit, Hartfor d, along with the other parties to this suit, attended an all-day settlement conference before the magistrate judge assigned to this case. At the conference, TFV agreed to settle its claims against all parties for $1.85 million. During the settlement conference, the magistrate judge informed Hartford that it could settle on behalf of EDC for $750,000. If Hartford chose not to settle, the magistrate advised the participants that EDC was going to consent to judgment in the amount of $1 million and assign its rights under the insurance contract to TFV. At Hartford's r equest, the magistrate judge allowed it two weeks to consider which of the two options it would accept.

Hartford chose not to settle on behalf of EDC. Instead, in a letter dated August 18, 1998, Hartford infor med EDC that it would now agree to provide EDC with a defense, subject to a reservation of rights as to coverage of the claim. See Appx. 377. On August 26, counsel for all parties participated in a telephone conference with the magistrate judge, during which the judge informed Hartfor d that, in spite of Hartford's offer to defend EDC, the parties had signed a settlement agreement. Under the final terms of the settlement, TFV received $500,000 from Sheffer and $350,000 from various parties, including NKK and the supplier of the steel used in the rod-eye's manufacture. The settlement also made EDC liable to TFV for $1 million. However, because EDC could not affor d to pay the $1

5

million settlement amount, it consented instead to a judgment against it in favor of TFV. TFV agr eed not to execute this judgment, and in exchange EDC assigned all of its claims against Hartford to TFV.

Thus, following the settlement, TFV and Hartfor d were the only two parties remaining in this suit. TFV moved, and Hartford cross-moved, for summary judgment. The district court granted Hartford's motion for summary judgment, finding that the late notice of the accident voided coverage. The district court also found that Hartford suf fered substantial prejudice due to the late notice because EDC's consent to disposal of the rod-eye prevented Hartford from examining the rod-eye itself. The district court believed that Hartford was further prejudiced because the late notice prevented it from filing a cross-claim for indemnification against Sheffer.

TFV appeals. We have appellate jurisdiction over both the grant of Hartford's summary judgment motion and the denial of TFV's motion. See 28 U.S.C. S 1291.

II. DISCUSSION

The decision below arises out of cross-motions for summary judgment. Such motions:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968). In addition, "when an appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court." Nazay v. Miller, 949 F.2d 1323, 1328 (3d Cir. 1991). Our review of the district court's decision on the motions for summary judgment is plenary. See International Union, United Mine

6

Workers of America v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir. 1990). We will uphold a grant (or reverse a denial) of summary judgment only when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c).

Because there is no dispute that New Jersey law governs in this case, we do not question its application. See Newport Assocs. Development Co. v. The Travelers Indemnity Co. of Ill., 162 F.3d 789, 791 (3d Cir. 1998). Under New Jersey law, the words of an insurance contract are given their ordinary meaning, unless they are ambiguous. See 495 Corp. v. N.J. Ins. Underwriting Ass'n., 430 A.2d 203, 206 (N.J. 1981). We test for ambiguity by asking whether the policy's phrasing is "so confusing that the average policyholder cannot make out the boundaries of coverage." Weedo v. Stone-E-Brick, Inc., 405 A.2d 788, 795 (N.J. 1979).

TFV presents two issues on appeal: (1) whether Hartford was appreciably prejudiced because it r eceived late notification of the accident and because the r od-eye was lost or destroyed and (2) whether the insurance contract between EDC and Hartford covered EDC's liability to TFV. We address these issues in turn.

A. Late Notice

The insurance contract between EDC and Hartfor d required that EDC notify Hartford pr omptly of any accident that might result in a claim:

> E. LIABILITY AND MEDICAL EXPENSES GENERAL CONDITIONS
>
> 2. Duties in the Event of Occurrence, Claim or Suit.
>
> a. You must see to it that we are notified promptly of an "occurrence" or an offense which may result in a claim.
>
> ***
>
> b. If a claim is made or "suit" is br ought against any insured, you must:
>
> (1) Immediately record the specifics of the claim

7

> or "suit" and the date received; and
>
> (2) Notify us as soon as practicable.
>
> You must see to it that we receive a written notice of
> the claim or "suit" as soon as practicable.

Appx. 256. The insurance contract defines an "occurrence" as "an accident" and a "suit" as "a civil proceeding in which damages because of . . . `property damage' .. . to which this insurance applies are alleged." See Appx. 260. Thus, the rod-eye failure qualifies as an"occurrence," and this cause qualifies as a "suit," as those ter ms are defined in the contract. Consequently, EDC was, upon learning of the accident, obligated to notify Hartford.

Hartford argues--and the district court agreed--that Hartford cannot be liable to EDC because EDC did not provide Hartford with prompt notice of the accident, as required under the insurance contract. However, for an insurer to assert the defense of late notice under New Jersey law, the insurer must prove not only that it was given late notice of the accident (here, TFV does not dispute that its notice was late), but also that it suf fered appreciable prejudice as a result of the late notice. See Chemical Leaman Tank Lines v. Aetna Casualty & Surety Co., 89 F.3d 976, 996 (3d Cir. 1996) (noting that New Jersey law requires showing of appr eciable prejudice); Solvents Recovery Service of New England v. Midland Ins. Co., 526 A.2d 1112, 1114 (N.J. App. Div. 1987) (noting that insurer bears burden of proving appr eciable prejudice). New Jersey courts look to two factors in analyzing whether a party has suffered appreciable pr ejudice: (1) whether substantial rights have been irretrievably lost by virtue of the insured's failure to give timely notice; and (2) whether the likelihood of success of the insurer in defending against the underlying claim has been adversely affected. See Chemical Leaman Tank Lines, 89 F.3d at 996-97.

Under New Jersey Law, mere conjecture or suspicions may not form the basis for establishing appr eciable prejudice. See Molyneaux v. Molyneaux, 553 A.2d 49, 54 (N.J. App. Div. 1989). Indeed, "the insur er [must] establish more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim,

8

[r]ather it must show that substantial rights have been irretrievably lost." Kitchnefsky v. National Rent–A–Fence of America, Inc., 88 F.Supp.2d 360, 368 (D.N.J. 2000) (internal citations and quotation marks omitted). These rights "include . . . `the preparation and preservation of demonstrative and illustrative evidence such as vehicles or photographs, and the ability of experts to r econstruct the scene.' " J.T. Baker v. Aetna Casualty & Surety Co., 1996 WL 451316 (D.N.J. 1996) (quoting Morales v. National Grange Mutual Ins. Co., 176 N.J. Super. 347, 355 (Law Div. 1980)).

Hartford believes that the above standar ds are satisfied by two actions it was unable to take as a result of the late notice: (1) it was denied an opportunity to inspect the failed rod–eye assembly on its own and (2) it was denied an opportunity to assert a cross–claim against Sheffer, the manufacturer of the rod–eye. We address in turn, and reject, both of Hartford's prof fered grounds for finding substantial prejudice.

Hartford first alleges that, if it only had r eceived prompt notice of the accident, it would have taken custody of the failed rod–eye assembly and undertaken its own full analysis of it. While it is true that the failed r od–eye has been irretrievably lost, it has been replaced by an independent professional metallurgist's comprehensive laboratory report that seemingly details all r elevant characteristics of the rod–eye at the time of failure. The rod–eye was fully tested by PSI, and Hartford has not stated any additional or different testing it would have pursued on its own had it had possession of the rod–eye. Instead, Hartford appears to argue that it need not show how it was prejudiced by loss of the rod–eye because, to its way of thinking, the loss of a piece of physical evidence will per se establish substantial prejudice. However , New Jersey law is not so generous; as noted, more than speculation and conjecture is required to establish substantial prejudice. Because Hartford has provided nothing beyond mere speculation, it has failed to show how it might have been appreciably prejudiced by its failur e to run its own tests on the rod–eye assembly.

Whether Hartford was prejudiced by its inability to fully pursue a cross-claim against Sheffer is a more difficult issue, but one that Hartford emphasized at oral argument. Hartford maintains that "EDC's breach of the notice provision of the Hartford policy also pr ejudiced Hartford by reason of EDC's failure to aggressively pursue a cross-claim for contractual indemnification from co-defendant Sheffer." Appellee's Br. at 20. There are several problems with this argument, not the least of which is the fact that an insurer who has not paid its insured's claim or pr ovided the insured with a defense has no right to obtain the benefit of the insured's claims against third parties. See Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartfor d, 367 A.2d 864, 868 (N.J. 1976); see also In re Joint Eastern & Southern Dist. Asbestos Lit., 78 F.3d 764, 779 (2d Cir. 1996). Here, Hartford received notice of the accident in March 1998 and was first sued under its policy with EDC in May 1998. Nonetheless, Hartford steadfastly refused coverage, or even a defense, to EDC until one week after a settlement was agreed to in August 1998. During the months following Hartford's initial notification of the accident, Hartford had ample opportunity to assist EDC, but turned down the chance to do so. Therefore, Hartfor d lost the right to pursue a cross-claim against Sheffer as a r esult of its own inaction, not by virtue of EDC's action.

Hartford's real problem appears to lie with EDC's decision to settle this case, thereby extinguishing its cross-claim against Sheffer. However, under New Jersey law, when an insurer refuses to defend its insured, the insured is free to settle with third parties, and the settlement may be enforced against the insurer. See Griggs v. Bertram, 443 A.2d 163, 171-72 (N.J. 1982).[1] Thus, EDC was free to

_____

1. We recognize that Hartford of fered to defend EDC one week after the settlement was agreed to. However, this fact is irrelevant to our discussion. Even if Hartford had been allowed to defend EDC, subject to a reservation of rights, EDC would have been able to enter the same settlement, for the attorney hired by an insurance company represents the insured, not the insurer. See Petty v. General Accident Fire & Life Assurance Corp., 365 F.2d 419, 421 (3d Cir. 1966). And "[w]hile the insurer is not compelled to disregard its own interests in representing or defending an insured, the insured's inter ests must necessarily come first." Lieberman v. Employers Insurance of Wausau, 419 A.2d 417, 422-23 (N.J. 1980). Accordingly, if an insur ed wants to settle (as did EDC), the attorney provided by the insur er must do so, even if the insurer objects.

10

settle, subject to limited oversight by Hartford. Of course, a settlement that is unreasonable in amount or entered into in bad faith is not enforceable against Hartford, but Hartford bears the ultimate burden of showing such frailties in the settlement. Griggs v. Bertram, 443 A.2d at 174. Hartford has not met that burden.

Here, EDC was justified, and perhaps even wise, to settle in the manner that it did. Under its contract with NKK, EDC warranted that it would provide equipment (including the rod-eye) that is "of merchantable quality, free from all defects in design, material and workmanship . . . ." Appx. 125. EDC was apparently liable, therefore, to NKK for supplying a defective product, even if the defect was due perhaps to Sheffer's manufacturing error. Hartford believes, however, that the indemnification clause in the boom cylinder purchase order clearly provided that Sheffer would fully indemnify EDC for any damages arising out of the defectiveness of the product. The clause reads: "[i]f this Purchase Order involves work to be performed by you at a job site, you, by the acceptance of this Purchase Order . . . agree to indemnify and save EDC incorporated against all claims for damages to persons or property arising out of the execution of the work." Appx. 140. The indemnification clause is not as broad as Hartford claims, for it only provides for indemnification when damages arise "out of the execution of . . . work" done at a job site. The damage caused by the failed rod-eye does not seem to meet these conditions. Thus, the purchase order's indemnification clause does not appear to provide EDC with any contractual indemnification. This being the case, Hartford has not shown that settlement was unreasonable because of the indemnification clause in the contract between EDC and Sheffer.

Of course, Sheffer might nonetheless have emerged from a trial with a substantial obligation of its own, arising out of a legal duty distinct from the above indemnification clause. For example, EDC's cross-claim against Sheffer contains the allegation that Sheffer failed to exercise due care in manufacturing the rod-eye. EDC might also have pursued an express or implied warranty claim against Sheffer. If ultimately proven at trial, these allegations might

11

have led to a significant amount of contribution from Sheffer. However, there is no guarantee that EDC could successfully prove these allegations at trial. Such uncertainty is a classic reason for settling, and here the settlement amounts paid by each party appear to reasonably reflect the parties' various responsibilities for designing, manufacturing and installing the r od-eye: TFV agreed to settle a $3.6 million claim for only $1.85 million, and of that amount, EDC was responsible for $1 million, Sheffer for $500,000 and other parties for the remaining $350,000.

Hartford has shown no evidence that the above amounts were somehow the result of collusive conduct or bad faith dealings between the parties. Indeed, the best ar gument Hartford could muster at oral argument was an appeal to equity, claiming that it only had two weeks to consider a settlement that arose out of a complex case involving thousands of pages of documents. Hartford's ar gument fails, however, because Hartford certainly had more than two weeks to familiarize itself with this case. EDCfirst sued Hartford over the insurance policy in May 1998. At that time, Hartford learned the facts of this case and formulated a litigation strategy based upon them, for Hartfor d denied that its policy obligated it to defend or cover EDC--a determination that required a familiarity with the facts and insurance policy. Consequently, Hartford had ample time to learn the facts and legal issues in this case and cannot now claim that the settlement is unfair because it was only allowed two weeks to make a settlement decision that all other parties were apparently able to make in one day. For these reasons, we find that the settlement is reasonable and the result of good faith dealings between the parties. Thus, Hartford has failed to show appreciable prejudice arising from the late notice of EDC's claim that it received.

B. Contract Coverage

Having found that Hartford was not appr eciably prejudiced by the late notice, we turn now to the question whether the insurance contract provides coverage of the rod-eye failure. The contract between EDC and Hartford provides up to $2 million of business liability coverage.2

_____

2. The relevant provision of the contract states that "[Hartford] will pay those sums that [EDC] becomes legally obligated to pay as damages

12

However, the contract also contains several standard exclusions.

The first relevant exclusion addresses the "products-completed operations hazard."3  Under this exclusion, the contract exempts from coverage any damage arising after the product or work leaves the insured's hands. Here, for example, the "products-completed operations hazard" exclusion would act to prevent coverage of damage arising from the rod-eye once the rod-eye has left EDC's control. However, under the EDC policy, the "pr oducts-completed operations hazard" exclusion does not apply when the work out of which the damage arises was perfor med by a subcontractor.

The second relevant exclusion, entitled "Exclusion-- Engineers and Architect Professional Liability," generally provides that insurance coverage will not extend to damage arising out of various professional services, such as product design.4 However, as noted by TFV, "[t]he exclusion for
_____

because of `bodily injury,' `property damage,' `personal injury' or `advertising injury' to which this insurance applies." Appx. 247 (Business Liability Coverage Form A.1.a). The $2 million limit is provided on page 5 of the Spectrum Policy Declarations in EDC's insurance contract with Hartford. See Appx. 213.

3. The "products-completed operations hazard" coverage exclusion states that the insurance contract does not extend coverage to " `Property damage' to `your work' arising out of it or any part of it and included in the `products-completed operations hazar d.' " However, this coverage exclusion does not apply "if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Appx. at 252. (Bus. Liab. Coverage Form. B.1.m.)

The contract defines "products-completed operations hazard" to "include[ ] all `bodily injury' and `property damage' arising out of `your product' or `your work' except: (1) Pr oducts that are still in your physical
possession; or (2) Work that has not yet been completed or abandoned." Appx. 260. B.10.a.

4. In full, the exclusion states that:

        This insurance does not apply to `bodily injury,'`property damage,'
        `personal injury' or `advertising injury' arising out of the rendering or
        failure to render any professional services by or for you, including:

13

professional services is . . . appropriately associated with a specialized knowledge and a mental or intellectual endeavor, not production, manufactur e or supply of goods and manufacturing." Appellant's Br. at 28 (citing Ostrager & Newman, Handbook on Insurance Coverage Disputes, S 7.02(b)(6) (10th Ed. 1999)). As such, the exclusion for professional services precludes coverage only if the damage arises out of a faulty design (either by EDC or Shef fer), as opposed to faulty manufacture.

We are thus left with the following after reading the relevant provisions of the insurance contract. The general liability provisions of the contract clearly cover the damage arising from the defective rod-eye: EDC has become legally obligated to pay damages because of property damage arising out of a product that it supplied and at least partially designed. However, two contract exclusions in the policy must also be considered. Under one exclusion (for "products-completed operations hazar d"), the contract provides coverage if the accident arose fr om a defect caused by Sheffer's manufacture of the rod-eye. Under the other exclusion (for "engineers and architects pr ofessional liability"), the contract provides coverage only if the accident is not attributable to a defect in EDC's or Sheffer's design of the rod-eye. Thus, Hartfor d's liability under the insurance contract turns on whether the accident was caused by a design defect, which would preclude coverage, or a manufacturing defect, which would not pr eclude coverage.

All of this leaves us with the task of trying to identify the defect in the rod-eye that caused it to fail and the party responsible for this defect. Perhaps because they both believed that this case would be decided on the issue whether there was appreciable prejudice, as it was in the district court, neither party has developed the r ecord or

_____

(1) The preparing, approving, or failing to prepare or approve maps,
    drawings, opinions, reports, surveys, change or ders, designs or
    specifications; and (2) Supervisory, inspection or engineering
    services.

Appx. 269.

presented arguments sufficiently for us to determine fully the cause of the rod-eye's failure. Indeed, EDC's own initial report of the accident, dated April 1995, lists ten possible causes of failure, including both design and manufacturing defects. See Appx. 151. The laboratory report from PSI indicates that the rod-eye's failure may be due to the use of an inferior grade of steel in the manufacture of the rod-eye, but the report is not entirely clear on its face and requires expert testimony to explicate it. See Appx. 159-62. As such, the precise reason for the rod-eye's failure is not apparent from the record on appeal.

Further, from the record, it is not even clear who specified how, and from what materials, the rod-eye should be built. For example, from the purchase order, which refers to a "Sheffer Hydraulic Boom Hoist Cylinder" and then provides detailed specifications, it appears that Sheffer built a custom version of a conventional hydraulic cylinder to EDC's specifications. In addition, the record does not reveal whether EDC specified the particular type of steel which failed (in which case the type of steel might be considered a design defect) and, if it did, whether Sheffer manufactured the rod-eye using the steel specified or, alternatively, a steel of lower quality (in which case the type of steel might be considered a manufacturing defect).

Accordingly, because the record is inadequately developed, we remand for trial (or possibly a showing on summary judgment) on the issue whether the rod-eye failure was caused by EDC's or Sheffer's design, which would presumably preclude coverage under the insurance contract, or Sheffer's manufacturing, which would allow coverage under the insurance contract.

III. CONCLUSION

For the foregoing reasons, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

15

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16